**Willie Lee MASON, Plaintiff,**

v.

**Fred MELENDEZ, Arthur Gerg, and Eugene Thomas, Defendants.**

No. 78–C–155.

United States District Court, W. D. Wisconsin.

Oct. 14, 1981.

---

Sarah B. O'Brien, Davis & O'Brien, Madison, Wis., for plaintiff.

Nadim Sahar, Asst. Atty. Gen., State of Wisconsin, Bronson C. La Follette, Atty. Gen., Madison, Wis., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is a civil rights action based on 42 U.S.C. § 1983 seeking monetary relief from certain members of the Wisconsin Parole Board and others. The matter was tried to a jury in January, 1981. The jury answered affirmatively the single question then remaining in the case: whether each of the three defendants, Melendez, Gergen, and Thomas, as members of a hearing panel of the board, had terminated plaintiff's parole hearing because the plaintiff had refused to waive (give up or withdraw) his objection to the presence of certain information in his file. The jury awarded plaintiff one dollar as nominal damages. Judgment on the verdict was entered. Defendants' motion for judgment notwithstanding the verdict (judgment n. o. v.) currently is before the court.

The complaint named as defendants, among others, the defendants Melendez, Gergen, and Thomas, as the three members of the board who sat as a panel to hear plaintiff's application for parole. The complaint alleged that the said three defendants had violated in various ways rights secured to plaintiff by the Constitution of the United States. By the time the case was submitted to the jury, only the said three defendants remained in the case, and the only surviving allegation of the complaint against them was the allegation that they had terminated the hearing because plaintiff had refused to waive his objection to the presence of certain information in his file.[1] Therefore, I approach the present issue as if only Melendez, Gergen, and Thomas had ever been named as defendants, and as if the only allegation ever made against them had been that they terminated the hearing because plaintiff refused to waive his objection to the presence of certain information in his file.

The facts relevant to my decision on the present motion for judgment n. o. v. are set forth below under the heading "Facts." Whenever I use the term "defendants" hereinafter, I refer only to Melendez, Gergen, and Thomas.

### Facts

Defendants filed a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., in April, 1978, in response to plaintiff's complaint. They argued that the complaint

---

1. The complaint was much less precise in its statement of this proposition, but in the course of pretrial proceedings and in the course of formulating the special verdict question, I held that, liberally construed, the complaint embodied this allegation.

failed to state a claim upon which relief could be granted, because, when processing parole applications and conducting parole release hearings, defendant parole board members perform a quasi-judicial function and are absolutely immune from liability for money damages in actions based on 42 U.S.C. § 1983. The court decided in an order dated October 18, 1978, that the record was not sufficiently developed on the nature of Wisconsin Parole Board proceedings to permit findings of fact necessary to a determination whether parole board members should be accorded full immunity from all claims for money damages. Defendants' motion to dismiss was denied.

On February 27, 1979, in their answer to the complaint, defendants raised the same defense of absolute quasi-judicial immunity. On March 26, 1979, plaintiff filed a motion for summary judgment, arguing that the parole board's actions were unconstitutional. Defendants did not file a counter motion for summary judgment, but filed a brief requesting not only that plaintiff's motion for summary judgment be denied, but that summary judgment be entered in defendants' favor. Defendants' brief was supported by submission of a copy of rules and regulations governing the procedures of the Wisconsin Parole Board. It was not supported by any other factual material directed to the matters relevant to whether the members of the Wisconsin Parole Board should enjoy absolute immunity from liability for money damages, qualified immunity, or no immunity. Following a pretrial conference, plaintiff's motion for summary judgment was denied in its entirety and defendants' request, by brief, that summary judgment be entered in their favor was granted, except for the single issue described above. On that issue, defendants' request for summary judgment in their favor was denied, and the issue was scheduled for trial by jury. It was necessarily implicit, but was not made explicit, that in regard to the single surviving issue, and on the record as then developed, defendants were not entitled to summary judgment on any theory, including the theory of immunity, whether absolute or qualified.

After plaintiff had rested his case before the jury, defendants moved for a directed verdict. In his statement in support of that motion, counsel for defendants did not contend that defendants were entitled to any form of immunity, but rather that plaintiff's evidence had failed to show that the reason for defendants' termination of the hearing was that plaintiff had refused to waive his objection to the presence of certain information in his file. The court denied the motion, and defendants then presented their case. Defendants did not move for a directed general verdict at the close of all the evidence. Defendants did not request a special verdict question relating to absolute immunity. No such question was put to the jury. The jury found that each of the defendants had terminated plaintiff's parole hearing because plaintiff had refused to waive his objection to the presence of certain information in his case file. The jury also awarded plaintiff one dollar in nominal damages. I concluded that these jury findings entitled plaintiff to judgment in his favor. Judgment for plaintiff was entered in the sum of one dollar on January 30, 1981. Defendants' motion for judgment n.o.v. was filed on February 9, 1981. The ground for the motion is that defendants enjoy absolute immunity.

A conference was held on April 8, 1981, to consider the manner in which the court should proceed to decision on the absolute immunity issue, now renewed in the motion for judgment n.o.v. At that conference the court posed three questions and then issued a memorandum posing those questions. One question was whether either party wished to present additional evidence relevant to whether membership in the Wisconsin Parole Board is the kind of office that should enjoy absolute immunity. Defendants neither asked to submit, nor submitted, additional evidence on that matter.

Defendants now emphasize that their motion for judgment n.o.v. concerns whether defendants are absolutely immune as a matter of law, as opposed to whether the evidence was sufficient to raise a factual issue for the jury's consideration about the

reason for defendants' termination of plaintiff's parole hearing. Consequently, defendants argue, neither a motion for a directed verdict at the close of all the evidence nor even their present motion for judgment n.o.v. was necessary to preserve the absolute immunity bar to an award of money damages against them. Their brief requests this court to construe their motion for judgment n.o.v. as a motion to alter the judgment. Fed.R.Civ.P. 59(e).

## Opinion

Three circuits have held that members of parole boards are entitled to absolute immunity from liability for damages in § 1983 lawsuits when acting in a quasi-judicial capacity. *See Sellars v. Procunier*, 641 F.2d 1295 (9th Cir. 1981); *Pope v. Chew*, 521 F.2d 400 (4th Cir. 1975); *Cruz v. Skelton*, 502 F.2d 1101 (5th Cir. 1974). The Third Circuit has conferred absolute immunity on parole boards' "adjudicatory" decision-making, but only qualified immunity on their "administrative" actions. *Thompson v. Burke*, 556 F.2d 231 (3d Cir. 1977). Several district courts in these and other circuits also have taken the position that members of parole boards should be given absolute immunity from liability for damages in civil rights suits. *E. g., Bricker v. Michigan Parole Board*, 405 F.Supp. 1340 (E.D. Mich. 1975); *Garvey v. Casson*, 423 F.Supp. 68 (D. Del. 1976). Few recent decisions have awarded only qualified good faith immunity to members of parole boards. *E. g., Joyce v. Gilligan*, 383 F.Supp. 1028 (N.D. Ohio 1974). *See also Henzel v. Gerstein*, 608 F.2d 654 (5th Cir. 1979) (parole board official protected by only qualified immunity when making telephone calls concerning parolee's visits to other states). The Supreme Court of the United States has expressly reserved the "question of what immunity, if any, a state parole officer has in a § 1983 action where a constitutional violation is made out by the allegations." *Martinez v. California*, 444 U.S. 277, 285, n.11, 100 S.Ct. 553, 559, n.11, 62 L.Ed.2d 481 (1980).

Although no decision by a state or federal court cited by counsel or known to me has held that members of the Wisconsin Parole Board are absolutely immune from § 1983 damages, there is a serious possibility that this would be the result in a case reaching the merits of this issue. In this case, defendants have raised the asserted absolute immunity bar in a Rule 12(b)(6) motion, then in a request for summary judgment in their brief opposing plaintiff's motion for summary judgment, and now in a motion for judgment n.o.v. Plaintiff's argument opposing this motion for judgment n.o.v. relies on a procedural rule whose enforcement would prevent reaching the merits of the immunity question.[2] Under these circumstances, on my own motion, I will reexamine my decisions denying defendants' earlier motion to dismiss and denying their later request by brief for an award of summary judgment. I must reach the pending motion for judgment n.o.v. only if I adhere to the two earlier rulings.

Immunity from damages, whether absolute or qualified, represents a sharp departure from the principle that persons are responsible for the harm they inflict upon one another, and that the victims may seek compensation from the perpetrators. When constitutional guarantees are at stake, extensions of the doctrine of immunity, particularly absolute immunity, seriously erode the practical significance of those guarantees. *Butz v. Economou*, 438 U.S. 478, 505, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978). Nevertheless, it is clear by now that in actions under 42 U.S.C. § 1983, there persist certain immunities rooted in the common law as of 1871, when § 1983 was enacted, and also there exist certain immunities in § 1983 actions for those who perform more "modern" functions sufficiently analogous to those functions which enjoyed immunity at common law. *Sellars v. Procunier, supra*, 641 F.2d at 1298. The functions of judges of courts of law are the classic example of functions enjoying absolute immu-

---

**2.** Rule 50(b), Fed.R.Civ.P., permits a motion for judgment n.o.v. only by a party who has moved for a directed verdict at the close of all the evidence. 9 Wright and Miller, *Federal Practice and Procedure* (1971 & Supp. 1981) § 2537, p. 596.

nity at common law as of 1871, *see Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 346–354, 20 L.Ed. 646 (1872), while the functions of parole boards are a good example of more modern functions for which some form of immunity is sought on the ground that they are sufficiently analogous to the function of judges of courts of law. *Sellars, supra*, at 1298, n.6.

█ When absolute immunity is claimed by a public officer, there are two questions to be addressed. The first and general question is whether members of a governmental body such as the Wisconsin Parole Board, for example, should enjoy absolute immunity when they perform a certain function such as, for example, deciding whether a hearing on a parole application should be aborted or should proceed to a decision on the merits of the application. Assuming that the first and general question is answered affirmatively, the second and particular question is whether a defendant in a case at hand was a member of such a governmental body and was performing such a function when he or she committed the act of which the plaintiff complains.[3]

When the first and general question has been answered affirmatively and authoritatively in some earlier case, the task of the trial courts in subsequent cases is simple and straightforward. Had the Supreme Court of the United States or the United States Court of Appeals for the Seventh Circuit already decided in a § 1983 case that absolute immunity from damages is enjoyed by members of a state parole board while exercising a broad range of functions, including the function of deciding whether to proceed with or to abort a hearing on a parole application, it would have been necessary in the present case in this court only to determine whether the functions of the Wisconsin Parole Board resemble closely enough the functions performed by the state parole board in the case that marked the authoritative precedent, and, if so, to determine whether these particular defendants were actually members of the Wisconsin Parole Board performing one of the immunized functions when they committed the act of which the plaintiff complains. No such decision by the Supreme Court or the Court of Appeals for this circuit has been cited by counsel and I have become aware of none. Therefore, it is necessary in this case in this court to address that first and general question.

I have no doubt that fact-finding must precede an answer to that first and general question.[4] There is required "... a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler v. Pachtman*, 424 U.S. 409, 421, 96 S.Ct. 984, 990, 47 L.Ed.2d 128 (1976). The process of identifying the "relevant" official is a factual inquiry. That is, it must focus upon the true nature of the office occupied by the defendant official in the case at hand and the function or functions truly performed by him or her. For example, what, in fact, is the function or set of functions assigned to and performed by a city building inspector, a game warden, a member of a board of bar commissioners, a register of

---

**3.** When qualified immunity is sought, the same first and general question and the same second and particular question must be answered. If they are answered affirmatively, then two additional and particular questions must yet be answered: (3) did the defendant actually believe that his or her conduct was lawful? (4) was that belief objectively reasonable at that time and place? In the present case, I have ruled that because the defendants denied committing the act which the jury found that they did commit, there could be no question of fact concerning their good faith in committing the act. Although that ruling is open to challenge, of course, the pending post-judgment motion by defendants, however construed, is not directed to that ruling. The pending post-judgment motion rests exclusively on the contention that defendants are entitled to absolute immunity. In the remainder of this opinion, unless otherwise noted, the immunity discussed is absolute immunity.

**4.** Throughout the remainder of this opinion, unless otherwise noted, the discussion of fact-finding relates to the first and general question described above in the text, and not to the second and particular question, which need be answered only when the first and general question has been answered affirmatively.

deeds, a prothonotary, a dean of a college, an insurance commissioner, a county surveyor, a pardon counsel? For many casual purposes, to mention the title of any of these officials is to convey a sufficiently reliable impression of the functions he or she performs. But such titles are not uniform among the states of the union, or among the thousands of local units of government.[5] For more serious purposes, and when erosion of constitutional guarantees is an inevitable consequence of the extension of immunity to one who performs a certain governmental function, not only must applicable statutes and regulations be consulted as to the function of each particular governmental officer, but inquiry must be directed to the reality of custom and practice. *See Foley v. Alabama State Bar,* 648 F.2d 355, 360 (5th Cir. 1981); *Slavin v. Curry,* 574 F.2d 1256, 1262 (5th Cir. 1978).

While, no doubt, the general nature of parole systems is reasonably widely and accurately understood, those systems do vary significantly from state to state, and between the federal system and the state systems. Also, within a given system, there is variety in the nature and degree of importance of the functions performed by those who are employed within it. For example, courts are aware that some members of some parole departments promulgate the conditions to be imposed upon parolees, some supervise and counsel with parolees, some investigate possible violations of conditions of parole, some recommend termination of parole and others order the termination, some promulgate the standards by which parole is to be granted or withheld, some recommend the grant of parole and others order it granted. Among those dealing most directly with the grant or withholding of parole, some decisions bear on whether and when a hearing is to be held on an application for parole, some on the mode of such a hearing, some on the termination or continuation of such a hearing, and some on the merits of the application.

In the present case, the immunity sought is absolute and the analogy pressed is to the function performed by judges of courts. That is, it is contended that a judge of a court is "the relevant official at common law." The "interests behind" the "immunity historically accorded [judges of courts] at common law" are the relevant interests. *Imbler v. Pachtman, supra,* 424 U.S. at 421, 96 S.Ct. at 990. These "interests" or policy considerations have been stated in varying degrees of grandiloquence, *Bradley v. Fisher, supra,* 80 U.S. at 348–349; *Sellars,* 641 F.2d at 1299–1300; 46 Am.Jur.2d *Judges* § 72, at 141–143 (1969), and include, principally: the importance of the freedom of the decision-maker to render a decision uninfluenced by apprehension of consequences to him or her; the importance of sparing the decision-maker diversion of his or her attention and energies from the decision-making task; the importance of repose in the resolution of controversies; and the presence of other safeguards which diminish the likelihood of frequent error or misconduct on the part of the decision-maker.

Before the first and general question can be decided (whether members of a governmental body, such as a state parole board, should enjoy absolute immunity when performing a certain function, such as deciding whether a hearing on an application for parole should be aborted), it is clearly desirable that maximum information be gathered on a number of points. Among those points are the following:

(1) The degree of the intrinsic importance of decisions whether to grant or deny parole, as compared with the general run of decisions made by judges of courts. Their importance to the parole applicants is obvious. They are clearly important to the community as well, although the degree of importance probably varies depending upon the violent or nonviolent conduct to which the applicant

---

5. When Harry Truman served as county judge for the eastern district of Jackson County, Missouri, he served, not as a "judge," but as a member of what is called the "county board" in other parts of the United States. Steinberg, *The Man from Missouri* 66–80 (1962).

might be considered prone, upon the duration of the interval between the putative parole date and the mandatory release date, and other factors.

(2) The relationship between a decision on the merits whether to grant or to deny parole, on the one hand, and a decision to continue with or to abort a hearing on that question, on the other. No doubt the absolute immunity of judges of courts would extend to both kinds of decisions. But, in the context of the present case, it would be useful to learn whether some authority other than the members of the parole hearing panel decides the nature and range of the information upon which the panel is to base its decision in a particular case and decides how the panel must respond to objections to the presence or absence of specific items of information.

(3) The relationship between a qualification or limitation upon the immunity of parole board members from money damages, on the one hand, and the degree of objectivity of their decisions, on the other. This would require analysis of the pressures, other than potential financial liability, which may already threaten objectivity. Those pressures which come readily to mind include: the fact that a certain portion of the parole applicants may have a history of violent behavior and this history may be the very reason militating against a grant of parole; the potential for public outcry when a parolee is accused of a new offense during the parole period; and shortage of prison space, resulting from fiscal problems and sporadic waves of severity by sentencing judges.

(4) The frequency with which members of parole boards have actually been sued in the past, and the outcome of such lawsuits, including the dollar amounts of those judgments which have been entered. This information would be useful both in terms of the possible diminution of objectivity and in terms of the diversion of the members from their assigned tasks. In the latter connection, it would be useful to have rather specific information on the portion of the lawsuits that require attendance at conferences with counsel, court hearings, and trials.

(5) The nature and extent of the present demands upon the time and energy of the members of the parole board in the execution of their assigned duties.

(6) The nature and significance of state legislation providing indemnification from the state treasury to public employees against whom money judgments are entered.

(7) The nature and extent of other safeguards, legal and practical, against wilful misconduct by parole board members.

### I. *Judge or jury as fact-finder?*

Because the immunity sought is immunity from damages, it follows that typically the cases in which its existence is in question are jury cases. The truly perplexing problems posed by the procedural history of the present case are: whether the fact-finding which must precede the decision of the first and general question on the immunity issue is fact-finding to be performed by the jury or by the judge; and, if by the judge, in what procedural setting and in what mode is he or she to perform it?

There is a distinction, of course, in jury cases, between the judge's function in deciding motions for summary judgment under Rule 56 and motions for directed verdicts under Rule 50, on the one hand, and the judge's function as a true fact-finder, on the other. In deciding Rule 56 motions, the judge is inquiring whether any fact-finding whatever is required, by judge or by jury. If so, the motion must be denied. In deciding Rule 50 motions, the judge is inquiring whether any fact-finding whatever by a jury is required. If so, the motion must be denied. In the discussion which follows, unless otherwise noted, when I refer to fact-finding, I will be referring to true fact-finding: resolving conflicts in the evidence and assigning varying degrees of weight to various bits of evidence.

It is familiar and firmly established doctrine that in jury cases, the facts are to be found by the jury and the applicable law is to be enunciated by the judge. However, Rule 12, Fed.R.Civ.P., enumerates certain defenses in subparagraph (b), and provides in subparagraph (d) that any of the defenses enumerated in (b) shall be heard and determined before trial on application of any party, unless the judge decides to defer until trial the hearing and determination. The defenses enumerated in (b) include defenses which cannot be determined without fact-finding. Because of Rule 12, and for other reasons, it has become widely accepted that in jury cases, certain fact-finding may be performed by the judge. Jurisdiction and venue are two subjects as to which the judge's power to find facts is most clearly established. *See* 5 Moore's *Federal Practice* (1981) § 38.36.

There must be considered also whether it is practically possible for a jury to perform the kind of finding and weighing of facts necessary to decision of the first and general question on the immunity issue. Finally, there must be considered how the courts, particularly appellate courts, and most particularly the Supreme Court of the United States, have actually behaved in allocating, as between judges and juries, the fact-finding necessary to decision of the first and general question on the immunity issue.

### A. *Subject matter jurisdiction: judge as fact-finder*

■ When a claim is to qualified immunity, rather than absolute, it is plain that the claim is not that jurisdiction is absent. "The fate of an official with qualified immunity depends upon the circumstances and motivations of his activities, as established by evidence at trial." *Imbler v. Pachtman, supra,* 424 U.S. at 419, n. 13, 96 S.Ct. at 989, n. 13. That is, defendant requests that in the exercise of the court's jurisdiction, the privilege be granted. The same is true of a claim to the broader privilege of absolute immunity. *Robinson v. Bergstrom,* 579 F.2d 401, 404 (7th Cir. 1978). In *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1977), in which the absolute

immunity of judges of courts was reinforced even in most extreme circumstances, the district court had granted a Rule 12(b)(6) motion to dismiss as to the defendant state court judge for failure to state a claim. The court of appeals had reversed the judgment entered by the district court. The Supreme Court reversed the judgment of the court of appeals. Had it then ordered reinstatement of the district court judgment of dismissal, the order of the Supreme Court would have been an unequivocal holding that the absolute immunity of a defendant officer does not deprive the court of jurisdiction. Instead, the Supreme Court remanded the case for further proceedings consistent with its opinion. In a concluding footnote, however, the Court makes clear its reason for remanding rather than concluding the case: the further proceedings in the lower courts were to be directed to the question whether the dismissal of the action as to other defendants had been required because of the dismissal as to the defendant state court judge. *Id.* at 364, n. 13, 98 S.Ct. at 1109, n. 13. In *Robinson v. Bergstrom, supra,* 579 F.2d at 404, the court of appeals cited *Stump v. Sparkman* as authority for the proposition that jurisdiction does not turn on the presence or absence of the absolute immunity of a defendant, and I so regard it.

I linger, because a pinch of uncertainty on the point arises from language to the effect that one of the purposes of absolute immunity is to spare its possessors the need to defend against suits for damages, that its effect is to defeat such a suit at the outset, and that such a suit will not survive the pleadings. *See Imbler v. Pachtman, supra,* 424 U.S. at 419, n. 13, 425, 96 S.Ct. at 989, n. 13, 992; *Sellars v. Procunier, supra,* 641 F.2d at 1297, n. 4, 1303; *Knell v. Bensinger,* 522 F.2d 720, 724, n. 5 (7th Cir. 1975); *Hampton v. City of Chicago, Cook County, Illinois,* 484 F.2d 602, 607 (7th Cir. 1973). Even if jurisdiction is absent, of course, a defendant cannot avoid the necessity to serve and file a Rule 12(b)(1) motion to dismiss. Extravagance occasionally marks the description of the degree to which absolute immunity rids its possessors of the

burden of defending lawsuits. For example, if a summons and complaint were to be served upon a judge of a state court in a suit for money damages commenced in a federal district court, prompt dismissal on the ground of absolute immunity could occur only if the federal district court were to be persuaded that the state court in question is truly a "court," as that term was understood at common law, or that the particular state court is closely analogous to such a common law court, and also that the conduct complained of by the plaintiff constituted an exercise of a power of that state court, such as an adjudication of the merits of a controversy, rather than, perhaps, the performance of the *ex officio* duties of the defendant state judge as a member of a board overseeing the operations of some public institution like a school or hospital.[6] I appreciate, of course, that busy federal district courts might well telescope this inquiry radically, but such peremptoriness merely blurs the perception of the steps necessary to decision. In any event, in *Imbler* itself, in the course of granting absolute immunity from damages to the defendant prosecutor, it was an order of dismissal for failure to state a claim, Rule 12(b)(6), which was affirmed, rather than an order granting a Rule 12(b)(1) motion to dismiss for lack of jurisdiction. 424 U.S. at 416, 96 S.Ct. at 988.

In the present case, jurisdiction over the subject matter is conferred by 28 U.S.C. § 1343(3). Defendants contend that in its exercise of this subject matter jurisdiction, the court should afford them a privilege, namely, immunity from damages.

I conclude that a claim to immunity from damages, whether absolute or qualified, is not a claim that jurisdiction is absent.[7] Therefore, the rule that permits judges to engage in fact-finding in jury cases on questions of subject matter jurisdiction does not authorize judges to perform fact-finding necessary to decide whether immunity, whether absolute or qualified, is present.

B. *Jurisdiction over the person and venue: judge as fact-finder*

Subject matter jurisdiction goes to the judicial power of the national government to deal with certain subjects. In relation to federal district courts, it goes to the judicial power which Congress has granted them to deal with those subjects. Its absence cannot be overcome by agreement of the parties or by waiver of objection. Jurisdiction over the person goes also to judicial power. But it goes to the court's power to bring a certain person before it, as contrasted with another person, and to subject that person to the court's orders bearing on subject matter concerning which the court has power to act. A person who is not amenable by law to the court's power may submit to it by appearing without objection. Venue goes to the question of the geographical district in which the court may exercise its power to deal with a certain person on a certain subject matter. It goes to the convenience of the litigants. A person amenable to the court's power over him or her on a certain subject matter but not amenable to the exercise of that power in a certain geographical district may submit to it by appearing without objection in that district. 1 Moore's *Federal Practice,*

---

**6.** See *Harper v. Merckle*, 638 F.2d 848 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981).

**7.** See *Scheuer v. Rhodes*, 416 U.S. 232, 234–236, 94 S.Ct. 1683, 1685–86, 40 L.Ed.2d 90 (1974) (implication that, unlike sovereign immunity under the Eleventh Amendment, considered as jurisdictional, absolute executive immunity would justify dismissal for failure to state a claim); *Boyd v. Carroll*, 624 F.2d 730 (5th Cir. 1980) (failure to plead judicial immunity waived the defense); *Rhodes v. Houston*, 258 F.Supp. 546 (D. Neb. 1966), *aff'd,* 418 F.2d

1309 (8th Cir. 1969), *cert. denied,* 397 U.S. 1049, 90 S.Ct. 1382, 25 L.Ed.2d 662 (1970) (jurisdiction implicit in dismissal on ground of judge's immunity); and *Larsen v. Gibson*, 267 F.2d 386 (9th Cir. 1959) (jurisdiction present in suit against members of state supreme court). *But cf. Miller v. Barilla*, 549 F.2d 648 (9th Cir. 1977). In *International Molders and Allied Workers, AFL–CIO v. Buchanan*, 459 F.Supp. 950 (N.D. Ala. 1978), *aff'd,* 618 F.2d 782 (5th Cir. 1978), and *Slavin v. Curry*, 574 F.2d 1256 (5th Cir. 1978), the exact procedural setting of the decisions is obscure in the reports.

*supra,* at § 0.60[8]. In the present case, no question has been raised either that a federal district court enjoys jurisdiction over the person of any of the defendants, or that the suit may be brought in the Western District of Wisconsin. Rather, defendants contend that in this properly venued action in which this federal court enjoys jurisdiction over them, the court should exercise that power by granting them the privilege of immunity from damages.

■ The point is, however, that if, in a jury case, a judge may perform the fact-finding function as it relates to a defensive contention that personal jurisdiction is lacking or a defensive contention that venue is improper, so perhaps may a judge perform the fact-finding function as it relates to a defensive contention that the privilege of immunity from damages should be granted. I think not. The entire matter of the allocation of the fact-finding function as between judge and jury in an action for damages must be viewed against the backdrop of the Seventh Amendment right to trial by jury. 5 Moore's *Federal Practice, supra,* at § 38.36. Against that backdrop, curtailments of access to a jury should be severely limited and responsive only to some clear and strong need. *See* 5A Moore's *Federal Practice, supra,* at § 50.02 (standards for granting motions for directed verdict). Because in jury cases the fact-finding function is permissibly performed by a judge as to one or two types of defenses which are waivable, it should not follow that the judge's intrusion is permissible as to all so-called affirmative defenses. Unless the considerations dealt with in IC and ID, below, require a different answer, it is sensible to abide by what may well be the present line of demarcation: in jury cases, when the issue goes to whether the federal courts generally have power to act on a certain subject matter or to whether a particular defendant is amenable to the power of a particular federal court in a particular district, the judge may perform the fact-finding function, but not otherwise.

C. *Practical difficulties in jury fact-finding*

The subject of general verdicts versus special verdicts and, as to special verdicts, the subject of how the questions are to be framed represent major themes in the history of judicial administration. *See* 5A Moore's *Federal Practice, supra,* Chapter 49, and Fed. R. Civ. P. 49. When a trial court is called upon to deal with what I have called "the first and general question" (whether those who perform certain functions of state parole boards are generally to be immunized from damages), it is probably unthinkable that the case could be submitted to a jury in the form of a general verdict only, finding simply for the plaintiff or the defendant. No doubt, either a special verdict, or a general verdict accompanied by answers to interrogatories, and probably the former, would be essential. But the difficulties in framing special verdict questions in constitutional litigation are profound. *See e.g.,* 3 Devitt and Blackmar, *Federal Jury Practice and Instructions* (1977 & Supp. 1980), Chapter 92. Even in a relatively simple case involving an alleged beating of a prisoner by his jailers, it is highly doubtful whether the constitutional balance between the plaintiff's liberty interest and the government's interest in security can be reduced accurately to a brief but readily understood set of instructions. *See id.* at §§ 92.05 (third element), 92.11, 92.12, 92.16. In administering jury trials in constitutional litigation, it becomes a virtual necessity for the trial judge to break the special verdict down into questions sufficiently specific and objective to permit the jury to function, with appropriately direct instructions, and then to enter judgment in the manner which constitutional doctrines are thought by the judge to require.

I refrain from detailed discussion of the difficulties which would beset a trial judge in framing special verdict questions and accompanying instructions dealing with the seven factors described at pp. 277 and 278 of this opinion.[8] I refrain also from

---

**8.** Even when an aspect of the second and more particular question on the absolute immunity

issue is to be answered (whether a particular

detailed discussion of the obscurity of the precedential function of the resulting judgment, residing as it would in the content of jury instructions, designed principally for aural, rather than visual, consumption.

Nevertheless, the Seventh Amendment clearly guarantees trial by jury in actions for damages under § 1983 and in the counterpart of § 1983 when federal officers are sued. With the moderating effects of Rule 56's provision for summary judgment, Rule 49's authorization of special verdicts, Rule 51's provision for instructions to the jury on the law, Rule 50's grant of power to direct verdicts, and the permissible exercise of judicial notice under Rule 201(f) of Fed. R. Evid., we are consigning to juries regularly the task of determining the facts on the basis of which are resolved, for the purpose of money damages, the most exquisitely subtle and complex tensions between freedom and authority in the United States. I cannot presently discern a principled basis on which wholly to withhold from a jury the fact-finding necessary to answer "the first and general question" on the immunity issue, as contrasted with other difficult issues.

D. *Actual practice of courts in allocating fact-finding function on immunity issue*

In *Butz v. Economou, supra*, 438 U.S. at 512–517, 98 S.Ct. at 2913–2916, the Court declared that: the conflicts dealt with in adjudication within a federal administrative agency are every bit as fractious as those that come to court; parties disappointed by the outcome of administrative adjudication often find vent in imputations of malice; the proceedings are adversary in nature; they are conducted by triers of fact insulated from political influence; oral or documentary evidence may be presented; the transcript of testimony, exhibits and pleadings constitute the record for decision; the parties are entitled to know the findings and conclusions on all issues presented on the record; the hearing examiner or administrative law judge may issue subpoenas,

rule on proffers of evidence, regulate the course of the hearing, and make or recommend decision; the process of adjudication is structured to assure that the examiner exercises his or her independent judgment; the risk of an unconstitutional act by one presiding at an agency hearing is outweighed by the importance of preserving his or her independent judgment; the decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to prosecute criminally; that decision is discretionary; the exercise of the discretion might be distorted if not shielded by absolute immunity; there is not likely to be anyone willing and able to seek damages from officials who decide not to authorize an administrative proceeding, but there is serious danger of retaliatory response to a decision to authorize such a proceeding; the targeted individual will react angrily and may seek vengeance in the courts; a targeted corporation will muster all of its financial and legal resources in an effort to prevent administrative sanctions and there is a strong incentive to counter-attack; the defendant in an enforcement proceeding has ample opportunity to challenge its legality, within the administrative proceeding itself and in the courts; the legal remedies available to the defendant are checks on agency zeal sufficient to justify a grant of absolute immunity; there is no substantial difference between the function of the agency lawyer who actually presents the evidence and that of the prosecutor who brings evidence before a court; agency lawyers must decide whether to proceed to trial where there is a sharp conflict in the evidence, especially in cases of wide public interest; the decision whether to proceed to trial is made difficult by the complexity and quantity of documentary proof; if agency attorneys were to be held personally liable in damages, they might hesitate to bring forward some witnesses or documents; it is very difficult if not impossible for attorneys to be absolutely certain of the objective

---

person was in fact exercising the power of a judge or a court when he or she committed the act complained of), framing special verdict

questions presents difficulties. *See Harper v. Merckle, supra*, 638 F.2d at 855, n. 6, 859–861.

truth or falsity of the testimony they present; the agency would often be denied relevant evidence; and the agency can act in the public interest only if it can adjudicate on basis of a complete record. The Court then observed that there remained "the task of applying the foregoing principles to the claims against the particular [officials of the United States Department of Agriculture] involved in this case." 438 U.S. at 517, 98 S.Ct. at 2916. Rather than to attempt this task, the Court directed that it be performed in further proceedings in the district court.

In *Imbler v. Pachtman, supra,* 424 U.S. at 421–427, 96 S.Ct. at 990–993, the Court declared that: the function of a prosecutor that most often invites a common law tort action is the decision to initiate a prosecution; the threat of § 1983 suits would undermine performance of the prosecutor's duties if only qualified immunity were granted him or her; the public trust of the prosecutor's office would suffer; suits against a prosecutor who enjoys only qualified immunity could be expected with some frequency, because a defendant often will transform his or her resentment into the ascription of improper and malicious actions to the prosecutor; if a prosecutor were required to answer in court to such charges, his or her energy and attention would be diverted from the pressing duty of enforcing the criminal law; if there were to be presented against prosecutors in § 1983 damage suits the issues now being presented in actions for post-trial relief, a virtual retrial of the criminal prosecution would be required, as would be the resolution of some technical issues by a lay jury; the honest prosecutor would face greater difficulty in meeting the standards of qualified immunity than would other executive or administrative officials; because a prosecutor frequently acts under serious constraints of time and information, he or she makes many decisions that could engender colorable claims of constitutional deprivation; defending those claims could impose unique and intolerable burdens on a prosecutor responsible annually for hundreds of indictments and trials; qualifying the prosecutor's immunity could have an adverse effect upon the functioning of the criminal justice system; accurate determination of guilt requires that the prosecutor enjoy wide discretion in the conduct of the trial and the presentation of evidence; this means that the prosecutor must be free to present witnesses whose veracity is subject to doubt before and after they testify; in the course of dealing with appeals and post-conviction collateral remedies, the focus of the reviewing courts might be blurred by subconscious knowledge that a decision in favor of the accused might result in the need for the prosecutor to respond in damages for an error or mistake in judgment.

I have indulged in extended summaries of portions of these two appellate decisions because they exemplify so dramatically the extent to which appellate courts have engaged in the fact-finding necessary to decide whether certain specific governmental functions should be shielded by immunity from damages. *See also Sellars v. Procunier, supra,* 641 F.2d 1295, 1302–1304 (9th Cir. 1981).

Rule 201, Federal Rules of Evidence, provides:

(a) Scope of rule. This rule governs only judicial notice of adjudicative facts.

(b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When discretionary. A court may take judicial notice, whether requested or not.

(d) When mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) Time of taking notice. Judicial notice may be taken at any stage of the proceeding.

(g) Instructing jury. In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

In *Economou* and in *Imbler*, available alternatives were to consign to juries or to trial court judges the function of hearing evidence and making findings, with or without the exercise of judicial notice under Rule 201, on the factual questions relevant to whether immunity, absolute or qualified, should be accorded the functions of those who decide whether to initiate administrative adjudication, those who present the evidence for the agency in such proceedings, those who act as hearing examiners and administrative judges, and those who prosecute criminal cases. These alternatives were foregone by the Court, without explanation. Because many of the facts declared by the Court in *Economou* and *Imbler* do not meet the Rule's definition of judicially noticed adjudicative facts (201(b)),[9] because there is no indication that the parties were notified of the Court's intention to notice the facts (see 201(e)), and because there is an absence of discussion of the jury's role (201(g)), it seems quite clear that the Court must have considered that it was engaged in judicial notice of "legislative facts," rather than "adjudicative facts." See 1 Weinstein *Evidence* (1980 & Cum. Supp. 1980) pp. 201–4 through 201–14, and §§ 200[01], 201[01], 201[02]. In any event, the opinions of the Court in these two cases teach by example that appellate judges are free to perform the fact-finding function, bearing on the presence or absence of an immunity, to the exclusion of any jury participation, and to do so uninhibited by the constraints of Rule 201.

Nevertheless, I remain uncertain how the fact-finding necessary to an answer to "the first and general question" on the immunity issue is to be performed. *Economou* and *Imbler* strongly suggest that I am free to perform the fact-finding necessary to that determination, to the entire exclusion of the jury. They do not reveal whether I must perform it. Also, they do not reveal whether, if and when I do perform it, taking judicial notice of "adjudicative facts" in combination with "legislative facts" would bring Rule 201 into play, as it seems it would, and, if Rule 201 is thus brought into play, whether its subsection (g), relating to jury trials, would become operative.

In the face of these uncertainties, I have decided to address the present case in two alternative ways. First, I will assume that it has been for the jury and not the trial judge to find the facts necessary to a determination of the first and general question on the immunity issue. This first alternative will include, of course, the assumption that, as in any jury case, Rules 50 (directed verdicts and judgments n. o. v.) and 56 (summary judgment), Fed.R.Civ.P., and Rule 201, Fed.R.Evid., apply. Second, I will

---

9. The answers to questions such as the following hardly seem "not subject to reasonable dispute," "generally known within" the Western District of Wisconsin, or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned": What is the incidence of imputations of malice by parties disappointed by the outcome of administrative adjudication? How serious is the danger of retaliatory response to a decision to authorize an administrative proceeding? How frequently do targeted corporations muster all their financial and legal resources in an effort to prevent administrative sanctions and how strong is the incentive to counter-attack? How difficult is the decision whether to proceed to trial made by the complexity and quantity of documentary evidence? How often would an agency lawyer refrain from presenting relevant testimony, in the absence of absolute immunity, for the reason that he or she is not absolutely certain of the truth of the expected testimony? How much of a prosecutor's energy and attention would be diverted to defending lawsuits against him or her if immunity were qualified? How badly distorted would be the decisions in post-conviction proceedings if the courts were subconsciously aware that a decision favorable to the defendant might be a prelude to an action for damages against the prosecutor?

assume that from first to last, it has been for the trial judge and not the jury to find the facts necessary to a determination of the first and general question on the immunity issue.

## II. *Jury as fact-finder*

### A. *Rule 12(b)(6) motion*

■ It is conceivable that a § 1983 complaint by a state prisoner against the members of a parole board hearing panel might be drafted so fully and meticulously that its factual allegations, taken as true, would be sufficient to permit a court to decide the first and general question on the immunity issue. That is, the complaint might conceivably include detailed allegations bearing on all seven factors described above at pp. 277 and 278. But the *pro se* complaint in this case contains little, if any, such information. Absolute immunity could not be granted these defendants in the absence of facts beyond those alleged in the complaint.

Neither at the time they submitted their 12(b)(6) motion nor at any subsequent time, so far as I can recall, have the defendants requested that I take judicial notice of any factual proposition bearing on the absolute immunity question. Had the defendants requested that in the course of deciding their 12(b)(6) motion, I take judicial notice of adjudicative facts, and had I elected to do so, it would have been necessary to treat the motion as a motion for summary judgment under Rule 56, and to provide the parties with the opportunity to present all material made pertinent to such a motion by Rule 56. Rule 12(b).[10] Rule 201(c), Fed. R.Evid., permits a court to take judicial notice of adjudicative facts, whether or not requested to do so, but in considering defendants' 12(b)(6) motion, the court was not obliged to initiate that process, and then to convert the motion to a motion for summary judgment.

However, as explained earlier, a question arises from the manner in which the Supreme Court proceeded in *Economou* and *Imbler* whether I was free to take judicial notice of legislative facts or possibly obliged to do so in deciding the 12(b)(6) motion, without treating the motion as a Rule 56 motion for summary judgment. In *Economou*, the motion by the defendant officials granted by the district court was a motion "pursuant to Rule 12(b) of the Federal Rules of Procedure for an order dismissing the second amended complaint on the ground that as to the individual defendants it is barred by the doctrine of official immunity...." (*See* record in *Butz v. Economou*.) The failure of movants to specify the subsection of Rule 12 relied upon in *Economou* is unfortunate. For reasons explained above in the discussion of jurisdiction and venue, I conclude that subsection (6) is the only possible subsection of Rule 12 upon which defendants could have relied in *Economou*. Thus it was a 12(b)(6) motion in a jury case upon which the court of appeals acted when it reversed the district court's order of dismissal. 535 F.2d 688. It was a 12(b)(6) motion in a jury case which was before the Supreme Court when it engaged in the extensive declaration of facts summarized above.

In *Imbler*, it was a 12(b)(6) motion which the district court granted and the court of appeals affirmed. 424 U.S. at 416, 96 S.Ct. at 988. It was a 12(b)(6) motion in a jury case which was before the Supreme Court when it engaged in the extensive declaration of facts summarized above.[11]

---

**10.** I believe that the same strictures do not apply to a decision whether leave to proceed *in forma pauperis* should be denied because the action is "frivolous," within the meaning of 28 U.S.C. § 1915(d). In that ex parte context, considerations of judicial economy justify an analytical process in which the court anticipates defenses likely to be raised and indulges at that stage in judicial notice of both legislative and judicial facts. *See e. g., Dodson v. Polk County,* 483 F.Supp. 347, 349, n. 2 (S.D.

Iowa, 1979), *aff'd in part* and *rev'd in part,* 628 F.2d 1104 (8th Cir. 1980), *cert. granted,* 450 U.S. 963, 101 S.Ct. 1478, 67 L.Ed.2d 612 (1980).

**11.** In other major recent cases decided by the Supreme Court on questions of immunity for public officials, the procedural posture has differed from *Economou* and *Imbler. Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (summary judgment);

Therefore, it appears that when the 12(b)(6) motion was pending in the present case, I may have been free (as the Supreme Court considered itself free in *Economou* and *Imbler*) to proceed forthwith to take judicial notice of legislative facts and to give them operative effect in deciding the 12(b)(6) motion. Nevertheless, I will persist in the assumption in this part II that it was not within my power to proceed in this manner on a 12(b)(6) motion, and that it was for the jury to perform the fact-finding necessary to answer the first and general question on the immunity issue. On that assumption, I adhere to my earlier denial of defendants' 12(b)(6) motion.

### B. *Defendants' request for summary judgment*

A Rule 56 motion by defendants, with the kind of factual showing required by Rule 56(c) and (e), might have been an adequate instrument for resolution of the absolute immunity issue on its merits. No such motion was served and filed by defendants.

*Pro se* plaintiff did move for summary judgment in his favor. Although not professionally presented, the motion was supported by an affidavit by plaintiff in which he made allegations, as to which he was a competent witness, that defendants had denied him access to information which was to be considered by them, that defendants had not removed erroneous information from the file, and that defendants had withdrawn his application for parole. Defendants responded to plaintiff's motion with an affidavit by defendant Melendez, who was also a competent witness to the circum-

stances in which the parole hearing was aborted. His affidavit directly controverted plaintiff's allegation about those circumstances. In that connection, and in response to other contentions by plaintiff which are no longer at issue in this case, defendant Melendez referred to various procedures promulgated for the handling of parole applications in Wisconsin. Attached to defendants' brief in opposition to plaintiff's motion is a document entitled "Wisconsin Department of Health and Social Services, Parole Board, Manual of Policies and Procedures." The cover page bears the date "March 1976." Stapled to the cover page is a slip reading: "5–9–77 Some sections of this manual are now obsolete. Appropriate revisions are expected to be made soon." The copy of the document is not sworn or certified. Rule 56(e). Plaintiff's parole hearing occurred January 17, 1978.

Defendants' brief in opposition to plaintiff's motion for summary judgment contained extensive argument, with citations to decided cases, that even if plaintiff's version of the manner in which the hearing on his parole application was terminated were to be accepted, defendants were entitled to absolute immunity or, in the alternative, qualified immunity. A major theme of that argument was that the safeguards attending the handling of applications for parole in Wisconsin tend to reduce the need for private damage actions as a means of controlling misconduct by parole officials. In the development of this theme, frequent reference was made by counsel to the Parole Board Manual of Policies and Proce-

---

*O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (jury verdict); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (judgment n. o. v.); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (jury verdict); *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (jury verdict). *See Sellars v. Procunier, supra,* 641 F.2d 1295 (summary judgment). In *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the motion to dismiss was based on Rule 12(b)(1) (lack of subject matter jurisdiction). *See* 471 F.2d 430, 450 (6th Cir. 1974). The district court granted the motion, holding that the action was barred by the Eleventh Amendment as an action against the State

of Ohio. (I agree that the Eleventh Amendment, when applicable, is clearly jurisdictional). The court of appeals affirmed. *Id.* But both courts indicated that the defendant state executives were absolutely immune from damages, on a common law immunity theory as well, independently of the Eleventh Amendment. The Supreme Court reversed, holding that subject matter jurisdiction was present, that the defendants were entitled only to qualified immunity, and that the application of the doctrine of qualified immunity to the particular acts of particular defendants required further proceedings, either by way of summary judgment or trial on the merits, 416 U.S. at 249–250, 94 S.Ct. at 1692–93.

dures. Except for the implied request that I take judicial notice of the content of the Manual, no request was made that I take judicial notice of facts bearing on the immunity issue.

■ When a plaintiff moves for summary judgment, a defendant does not serve and file a cross-motion for summary judgment, and the record developed on plaintiff's motion reveals that defendant is entitled to judgment, a court enjoys discretion to grant summary judgment to the nonmoving defendant. 10 Wright and Miller, *Federal Practice and Procedure* (1973 & Supp. 1981) § 2720. It is also well settled that this course may be followed only if great care is taken to assure that the moving party is afforded an adequate opportunity to show that there is a genuine issue as to one or more material facts necessary to the vindication of the legal theory relied upon by the nonmoving party. *Id.*

■ The copy of the Parole Board Manual submitted with defendants' brief in opposition to plaintiff's motion for summary judgment contained useful and relevant information concerning the philosophy of parole in Wisconsin, the general responsibilities of the Board, the form of organization of the Board, the policies and procedures, and parole criteria. However, even if I had treated defendants' request for a summary judgment as a motion and if I had accepted that copy of the Manual, despite the deficiencies in its submission, as evidence of the policies and procedures in effect as of January, 1978, there would have remained major gaps in defendants' showing on the first and general question on the immunity issue. The content of the Manual went to not more than two of the seven points described above at pp. 277–278. Therefore, I could not have held that on the material facts then developed in the record, as to which there was no genuine issue, defendants were entitled to summary judgment because they are absolutely immune.

I remain of the view that defendants' request that summary judgment be awarded to them as nonmoving parties was properly denied.

## C. *Motion for judgment n. o. v.*

As explained above, this part II proceeds on the assumption that it is for the jury to find the facts necessary to decision on the first and general question on the absolute immunity issue unless, prior to the point in the trial at which it would begin its deliberations, the jury is relieved of that fact-finding function in a permissible way, such as a meritorious Rule 12, Rule 56 or Rule 50 motion. In this case, by time of trial, the jury had not been so relieved. With the denial of defendants' motion for a directed verdict, made at the close of the plaintiff's evidence, the jury still had not been so relieved. When no motion for a directed verdict was made by defendants at the close of all the evidence, the jury still had not been so relieved. The jury then proceeded to perform its function by answering the special verdict question presented to it.

■ Unless some unusual circumstance requires a different result, the absence of a motion by defendants at the close of all the evidence defeats a subsequent motion by defendants, in the language of Rule 50(b), Fed.R.Civ.P., "to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with [their] motion for a directed verdict . . . ." (This is the motion to which I have referred throughout as a motion for judgment n. o. v.) The Court of Appeals for the Seventh Circuit has made clear, however, that it disapproves overly rigorous preclusion of a possibly meritorious contention simply because of a procedural oversight under Rule 50.

In *Bonner v. Coughlin,* 657 F.2d 931 (7th Cir., 1981), the court reviewed cases in which courts had relaxed the general rule. For example, in *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572, 576–77 (7th Cir. 1976), the trial court had denied defendant's motion for a directed verdict at the close of the plaintiff's evidence. Plaintiff moved for a directed verdict at the close of all the evidence. In the course of denying plaintiff's motion, the court recalled that it had denied

defendant's motion at the close of plaintiff's evidence and remarked that the situation had not changed since that time. Defendant then made a request for a jury instruction which all the participants effectively recognized as a motion for a directed verdict. Defendant was held to be free to move after verdict for judgment n. o. v. As another example, a motion for directed verdict at the close of the plaintiff's case, together with a request for a jury instruction made at the close of all the evidence could be found to be sufficient to place an issue before the court in timely fashion. *See Bachtel v. Mammoth Bulk Carriers, Ltd.*, 605 F.2d 438, 440–42 (9th Cir. 1979), *overruled on other grounds, Brown v. American Mail Line, Ltd.*, 625 F.2d 221 (9th Cir. 1980). Another setting in which the rule justifiably could be relaxed is when a party moves for directed verdict after both parties have rested their cases in chief, but before some rebuttal evidence is introduced. *See Ohio-Sealy Mattress Manufacturing Co. v. Sealy Inc.*, 585 F.2d 821 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979).

■ Here, however, there are no mitigating factors apparent that counsel relaxation of the rule. Defendants' motion for directed verdict at the close of plaintiff's evidence was not based on absolute immunity. Defendants made no request for a special verdict question on absolute immunity or for appropriate jury instructions on the absolute immunity issue. In fact, defendants ignored completely the issue of absolute immunity. It is appropriate that defendants be precluded from raising now the absolute immunity defense on a motion for judgment n. o. v.[12]

Two further points need be made.

■ Rule 49(a), Fed.R.Civ.P., provides that when a special verdict is used and the court omits from it any issue of fact raised by the pleadings or by the evidence:

. . . each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

Defendants made no demand that there be submitted to the jury any aspect of the first and general question on the absolute immunity issue. I made no finding. I did direct entry of judgment in plaintiff's favor on the special verdict. It appears that under Rule 49(a), I am deemed to have made whatever factual findings were necessary to rejection of the absolute immunity defense.

■ Finally, in connection with Rule 50(a), had defendants moved at the close of all the evidence for a directed verdict on the absolute immunity issue, the evidence presented would not have supported the motion. At the trial, there was testimony by each of the three defendants and also by the vice-chairman of the Wisconsin Parole Board, as well as the receipt in evidence of certain exhibits, including the Board's Manual of Policies and Procedures. Although there was no suggestion that they were being directed to the absolute immunity issue, the testimony and exhibits at trial did have bearing on that issue. However, the evidence at trial fell far short of meeting defendants' burden of proof on the seven points described above at pp. 277–278. It would be fair to say that with respect to the absolute immunity issue, defendants' trial evidence bore almost exclusively on the Board's procedures and perhaps on the existence of safeguards, other than vulnerability to damage claims, against wilful misconduct by parole board members.

---

12. To succeed fully on an absolute immunity defense, it was necessary for defendants not only to obtain a favorable determination of "the first and general question," but also on "the second and particular question": whether they were actually members of the Wisconsin Parole Board and whether they were actually engaged in the performance of an immunized function of that Board when they committed the act of which plaintiff complains. Partial summary judgment was not requested on that limited factual question. There was no request for a special verdict question, a directed verdict, or a jury instruction bearing on it.

For all the reasons stated, including the lack of merit which would have marked a motion for a directed verdict at the close of all the evidence, had one been made, there is lack of merit as well in defendants' motion under Rule 50(b) for judgment n. o. v.

### D. *Rule 59(e) Motion*

At the close of their brief in support of their motion for judgment n. o. v., defendants ask that the motion be construed as a motion to alter the judgment. Judgment was entered in this case on January 30, 1981. Defendants' brief was filed on June 6, 1981. "A motion to alter entry or amend the judgment shall be served not later than 10 days after entry of the judgment." Rule 59(e) Fed.R.Civ.P. *See also Hahn v. Becker*, 551 F.2d 741 (7th Cir. 1977). The court may not extend the time limit for filing a Rule 59(e) motion. Rule 6(b) Fed.R.Civ.P. *See also Nugent v. Yellow Cab Co.*, 295 F.2d 794 (7th Cir. 1961). The ten day limit was set because "there should be a definite point where it can be said that a judgment is final." Advisory Committee on Rule 6(b), 1946 Amendment. This principle would be subverted if I were to construe retroactively defendant's timely motion for judgment n. o. v. as a timely motion to alter the judgment. The Seventh Circuit Court of Appeals addressed a similar situation in a case in which plaintiffs who had failed to meet the ten day deadline asked the court to treat a motion for an extension of the time as a motion for a new trial. The court replied: "Plaintiff's motion 'cannot be measured by its unexpressed intention or wants.' It 'should be treated as nothing but what it actually was' ...." *Hulson v. Atchison, Topeka & Santa Fe Railway Co.*, 289 F.2d 726, 729 (1961), quoting *Johnson v. New York, New Haven & Hartford Railroad Co.*, 344 U.S. 48, 51, 73 S.Ct. 125, 127, 97 L.Ed. 77 (1952). On this basis, I decline defendants' request that their judgment n. o. v. motion be construed as a timely motion to alter the judgment.

### E. *Rule 60(b)(6)*

Defendants have made no motion to be relieved from the final judgment for "any other reason justifying relief from the operation of the judgment," Rule 60(b)(6), nor have they requested that their motion for judgment n. o. v. be so construed. Nevertheless, I consider this alternative. A Rule 60(b)(6) motion may be made "within a reasonable time." Continuing to view the case on the assumption that fact-finding on "the first and general question" was for the jury, I see no ground justifying relief for the defendants from a judgment based on a jury verdict.

### III. *Judge as fact-finder*

I now assume, alternatively, that it has been for me throughout, exclusive of any participation by the jury, to find the facts necessary to an answer to "the first and general question" on the absolute immunity issue. That is, I now assume that with respect to the absolute immunity issue, and only that issue, this action for damages has called for adjudication as if it were an action solely for equitable relief.

### A. *Rule 12(b)(6) motion*

I have understood that there is to be no distinction in the manner in which a court is to respond to a 12(b)(6) motion, whether the relief sought is wholly equitable or wholly monetary. If so, my comments in part II A of this opinion are equally applicable here. However, as explained in part II A, from the example set by the Supreme Court in *Economou* and *Imbler*, it appears that when defendants' 12(b)(6) motion was pending in the present case, I was free to take judicial notice of legislative facts and to give them operative effect in deciding the motion. Indeed, it may be that I was obliged to do so, if I had found it possible. It seems unlikely that the Supreme Court intends that trial judges should refrain from noticing and declaring legislative facts and thus refrain from proceeding to a correct adjudication of the first and general question on the absolute immunity issue, leaving it exclusively to appellate courts to perform this task. Also, because it was the pendency of 12(b)(6) motions which marked the posture of both *Economou* and *Imbler* when the Supreme Court

acted in them, it seems likely the Supreme Court intended that it be this initial stage of an action at which the trial judge should notice and declare the legislative facts and, if the trial judge then finds it possible, answer the first and general question on the absolute immunity issue.

At pages 277–278 of this opinion I have described seven points on which it would be desirable to possess maximum information. Other and additional points come readily to mind, but for convenience I will continue to refer to those seven. It is difficult to say whether they go to adjudicative facts or to legislative facts, or to a combination of the two; it is probably a combination. It is difficult too to guess whether there exist any data gained from social science research, empirical or otherwise, which could be helpful.

In the course of promulgating Fed.R. Evid. 201, the Advisory Committee on Rules of Evidence drew upon the writings of Davis,[13] Morgan,[14] and Thayer.[15] The thrust is that in their participation in the growth of judge-made law and in pondering questions of law and policy, it is essential that judges proceed in the realm of reality, rather than abstraction; that as to legislative, rather than adjudicative facts, they be uninhibited in their search for reliable information; and that in such a search they be freed of limitations in the form of indisputability, notice to the parties, and formal findings. 1 Weinstein *Evidence* pp. 201–4 through 201–12 (1980). However, the Advisory Committee noted, *id.* at 201–5, that there should be left open the possibility of receiving evidence through regular channels, citing *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934), in which there was a remand for the purpose of taking evidence on certain economic conditions and trade practices.

I consider the present case appropriate for the taking of evidence, or the formal exercise of judicial notice of adjudicative facts, concerning many aspects of the seven points described above at pages 277 and 278; for example: the *locus* of decision-making power about the content of the record to be considered on applications for parole; the nature and force of pressures other than fear of liability for damages; the frequency of suits for damages, the impact of such suits upon the time and attention of parole board members, and the experience with the outcome of such suits; and the nature of and practical significance of indemnification arrangements. At the time I denied the 12(b)(6) motion, I was unwilling to indulge in guesses about the seven points, and unwilling to accept responsibility for a factual inquiry without the assistance of the parties. I remain unwilling. I adhere to my earlier denial of the 12(b)(6) motion.

### B. *Rule 56 motion*

As explained in part II B, above, when defendants requested by brief that plaintiff's motion for summary judgment be denied and that, instead, summary judgment be granted them on the basis of absolute immunity, the properly presented factual record differed not at all from the record as it had stood when defendants made their 12(b)(6) motion. Even if the inadequacy of the presentation of the Manual had been overlooked, the factual record was far too meager to support summary judgment in defendants' favor. Under these circumstances, the comments I have just made in part III A, above, are apt. I reaffirm my earlier denial of defendants' request for summary judgment.

### C. *Motion for judgment n. o. v.*

■ Rule 50 is applicable only to jury trials. It is inoperative in trials to a judge.

### D. *Rule 41(b)*

■ Conceivably, defendants' motion for a directed verdict at the close of the plaintiff's evidence, pursuant to Rule 50(a), might have been construed as a Rule 41(b)

**13.** *A System of Judicial Notice Based on Fairness and Convenience*, Perspectives of Law 69 (1964).

**14.** *Judicial Notice*, 57 Harv.L.Rev. 269 (1944).

**15.** *Preliminary Treatise on Evidence*, 279–280 (1898).

motion for involuntary dismissal on the issue to be tried to the judge: absolute immunity. But absolute immunity is a defensive matter. The burden did not rest with the plaintiff to show the absence of facts necessary to absolute immunity. A 41(b) motion would have lacked merit.

### E. *Rule 59(e) motion*

The discussion in part II D, above, is fully applicable.

### F. *Rule 60(b)(6)*

 Persisting in the assumption that the issue of absolute immunity has been throughout an issue to be tried to the judge, to the exclusion of any participation by the jury, the circumstances as of the commencement of the trial were these: All motions and requests for pretrial dismissal of the single remaining claim as to the three remaining defendants had been denied. A jury had been drawn to hear and determine the facts relating to plaintiff's prayer for damages on that single claim, except that a trial judge was present to hear and determine the facts relating to the defense of absolute immunity. To the best of my recollection, none of the participants in the trial betrayed awareness that we were embarking upon such a dual enterprise.

The jury trial proceeded to a conclusion. The trial to the judge proceeded, but not to a conclusion. No findings of fact were entered, as contemplated by Rule 52(a). Judgment in plaintiff's favor was entered.[16] This is such an anomaly as to require consideration whether, on its own motion, the court should relieve the defendants from the judgment, on the basis of Rule 60(b)(6).

If the judgment were vacated, I would be in a position to make findings of fact, pursuant to Rule 52(a), on the immunity issue, based on the entire record developed at the trial at which I presided. However, as I have said, the evidence at trial fell far short of meeting defendants' burden of proof on the seven points described above at pp. 277–278. Following the filing of de-

fendants' motion for judgment n. o. v., a conference was held on April 8, 1981, to consider the manner in which the court was to proceed to decide the defendants' postjudgment effort to persist in the defense of absolute immunity. At that conference there was discussion whether defendants should be granted the opportunity, after judgment, to present evidence on the immunity question. In a memorandum entered April 9, 1981, one of "the questions to be resolved" was stated as follows:

> (2) If the defendants are entitled to raise the issue of absolute immunity at this stage of the lawsuit, does either party desire to present any additional evidence relevant to whether membership in the Wisconsin Parole Board is the kind of an office which should enjoy absolute immunity? If either party does desire to present additional evidence, should it be permitted to do so at this stage of the lawsuit?

No request has been made by the defendants to present additional evidence on the immunity issue.

Under these circumstances, and on the basis of the entire record, I am unwilling to relieve defendants of the judgment, on the basis of Rule 60(b)(6).

### Order

It is ordered that defendants' motion filed February 9, 1981, for judgment notwithstanding the verdict, pursuant to Rule 50(b), Fed.R.Civ.P., whether construed as written, or construed as a motion to alter or amend the judgment, pursuant to Rule 59(e), or construed as a motion for relief from the judgment, pursuant to Rule 60(b)(6), is denied.

---

**16.** I have referred earlier to Rule 49(a) in which it is provided that under certain circumstances, fact-finding by the judge is deemed to have been made in accordance with the judgment. But Rule 49(a) is applicable only to jury trials.