806 P.2d 40

Curtis COLLINS and Annie Collins, on Behalf of their son, Curtis M. COLLINS, Jr., and Sunwest Bank of Albuquerque, Conservator for Curtis M. Collins, Jr., Plaintiffs–Appellees,

v.

Ray TABET, Defendant–Appellant.

No. 18488.

Supreme Court of New Mexico.

Feb. 4, 1991.

Rehearing Denied Feb. 25, 1991.

Butt, Thornton & Baehr, Raymond A. Baehr, Alfred L. Green, Jr., Albuquerque, for defendant-appellant.

Ron Morgan, Albuquerque, for plaintiffs-appellees.

## OPINION

MONTGOMERY, Justice.

The court of appeals certified this case to us as involving the following question of substantial public interest:[1] "As guardian [ad litem], was Tabet acting as an arm of the court, cloaked with quasi-judicial immunity?" We answer: It depends. It depends on whether Tabet truly was appointed, and acted pursuant to that appointment, primarily as "an arm of the court," or whether his appointment as guardian ad litem constituted him, and he acted, primarily as an advocate representing the interests of his ward without responsibilities delegated to him by the appointing court.

In this opinion we explain this rather enigmatic answer and explore some of its implications.

## I.

Mikey Collins, the two-week old son of Curtis and Annie Collins, was diagnosed with spinal meningitis on December 31, 1977. Mikey was a normal, healthy baby up to the time he fell ill on the evening before this diagnosis. That evening, Mr. and Mrs. Collins took Mikey to the emergency room at Presbyterian Hospital in Albuquerque, where he was examined by Dr. Sollins and Nurse Ironsides and sent home. On the following day, Mr. and Mrs. Collins took him to the Indian Health Services Hospital, which referred the boy to a pediatrician. The pediatrician made the correct diagnosis and began treatment. The disease, however, had progressed to the point that Mikey was left permanently disabled—incapable of speaking, walking, feeding or bathing himself, or moving any limb except his right arm.

In April 1978, Mr. and Mrs. Collins retained an attorney, John Perrine, to pursue a medical malpractice claim against Presbyterian Hospital, Dr. Sollins, and Nurse Ironsides (the Hospital defendants) for failure to timely diagnose Mikey's disease. The plaintiff in the action, according to its caption in the district court, was "Curtis M. Collins [Mikey], individually and by his parents, Curtis and Ann Collins."

Settlement negotiations ensued between Perrine and the attorneys for the Hospital defendants and culminated in a settlement agreement reached in April 1979. The agreement provided for the Hospital defendants' payment of $46,000 in exchange for a release from any liability to Mikey or either of his parents. It was agreed that the settlement proceeds would be divided among Perrine (⅓), Mikey's parents for use on Mikey's behalf (⅓), and a trust for the purchase of a house in Mikey's name (⅓).

The attorneys who negotiated the settlement agreed that a guardian ad litem should be appointed for Mikey. Perrine was acquainted with defendant Ray Tabet, who officed in the same building as did Perrine, and had discussed various issues in the case with him previously. Tabet was an experienced trial lawyer, with considerable expertise in the field of medical malpractice. Perrine asked Tabet to serve as guardian ad litem, and the two of them met with Mr. Collins for a little over an hour on April 17, 1979, to discuss the settlement

---

1. As contemplated by NMSA 1978, Section 34–5–14(C)(2) (Repl.Pamp.1990).

and the trust arrangement for the funds to be set aside for Mikey.

On May 4, 1979, the district court entered an order appointing Tabet as guardian ad litem. The order provided only that Tabet was appointed "as friend of the Court and as guardian ad litem for the plaintiff, Curtis M. Collins, a minor." On May 7, the court held a hearing on the parties' motion for approval of the settlement. Before the hearing, Tabet signed an entry of appearance as an attorney for Mikey. Mr. and Mrs. Collins and Tabet testified at the hearing under questioning by defense counsel. Tabet testified that he had reviewed the claims, the nature of the injuries, and the nature of defendants' claimed liability and that the settlement was fair to the parties involved. The district court thereupon approved the settlement. On May 8, the day after the hearing, Tabet signed on Mikey's behalf a release of Mikey's claims against the Hospital defendants.

After the case against the Hospital defendants was settled, Perrine filed suit in federal court against the Indian Health Services (IHS). This suit was dismissed by the district court. However, Mr. and Mrs. Collins obtained new counsel and appealed to the Tenth Circuit Court of Appeals, which reversed the initial dismissal.[2] On remand, the district court held IHS liable for 40% of Mikey's damages, determined to be $3.9 million. The remaining 60% was attributed to the Hospital defendants. However, because of the previous settlement and the fact that New Mexico had abolished the concept of joint and several liability, plaintiffs were precluded from any further recovery against these defendants.

Mr. and Mrs. Collins and Mikey then filed suit in Bernalillo County District Court against Perrine and Tabet, seeking damages for their alleged malpractice in settling the case against the Hospital defendants. The case was tried to a jury, which found Perrine and Tabet to have been negligent and assessed Mikey's resulting damages at more than $2.9 million. Fault was apportioned 54% to Perrine, 39% to Tabet[3] and 7% to Curtis Collins, Mikey's father. The trial judge who had approved the settlement was found to be 0% at fault. Judgment was entered accordingly, and Perrine and Tabet each appealed to the New Mexico Court of Appeals, which at first consolidated the appeals and then severed them, issuing an opinion in Perrine's appeal and certifying Tabet's to this Court as stated above. See Collins v. Perrine, 108 N.M. 714, 778 P.2d 912 (Ct.App.), cert. denied, 108 N.M. 681, 777 P.2d 1325 (1989). In Perrine's appeal, the court in an opinion by Judge Apodaca affirmed the trial court judgment, holding against Perrine on questions of breach of duty and proximate cause, along with certain other questions listed in the opinion. See id. at 715, 778 P.2d at 913.

In its certification, the court of appeals divided three ways on the question certified. Stating that he would apply a "function-based analysis" to the question of the guardian's immunity, Judge Apodaca opined that Tabet was not entitled to quasi-judicial immunity, principally because Tabet's role "involved a more representational function than that of an impartial deci-

---

2. Collins v. United States, 708 F.2d 499 (10th Cir.1983).

3. The evidence as to Tabet's professional negligence was hotly disputed. There was information from which the jury could have concluded that the settlement was reasonable, given the circumstances prevailing in 1979 and the difficulty of establishing the Hospital defendants' liability. However, as Judge Apodaca said in his separate opinion on the question certified, the question on appeal is only whether or not substantial evidence supports the jury's verdict, viewing the evidence favorably to the prevailing party and disregarding contrary evidence. In that light, the jury could have found that Tabet did not know Mikey's expected life span at the time of the settlement, what Mikey's physical or mental condition was, what sources of health care were available to Mikey, or how strong the case against the Indian Health Services was; that he had not reviewed Perrine's file on the case, done any medical or legal research, or talked to any witnesses; that he relied exclusively on whatever information Perrine provided to him; and that if he had known Mikey's condition he might well have refused to approve the settlement. We hold in Part V of this opinion that there was substantial evidence to support the jury's verdict.

sion-maker and counsel to the court." Judge Apodaca, accordingly, would have affirmed.

Chief Judge Bivins, on the other hand, would have reversed; he took the position that Tabet was indeed "looking into the fairness and reasonableness of the settlement on behalf of the court, as an arm of the court, if you will, to protect the minor's interests." Thus, he would have extended to a guardian ad litem in Tabet's situation the absolute immunity with which a judge is cloaked in the performance of his duties. *See Vickrey v. Dunivan,* 59 N.M. 90, 94, 279 P.2d 853, 855 (1955) (dictum). *See also Ryan v. Scoggin,* 245 F.2d 54, 58–59 (10th Cir.1957) (applying New Mexico law to district court judge); *Edwards v. Wiley,* 70 N.M. 400, 374 P.2d 284 (1962) (justice of the peace); *Galindo v. Western States Collection Co.,* 82 N.M. 149, 477 P.2d 325 (Ct. App.1970) (same).

Finally, Judge Donnelly expressed the view that *limited* judicial immunity should be granted to guardians ad litem in this situation. He would have reversed and remanded the case for a new trial, in which Tabet would be granted immunity unless his actions were determined to have constituted gross negligence.

In accepting the certification, we requested the parties to file briefs on the immunity question and we heard oral argument. Like all three court of appeals judges, we believe that absolute, quasi-judicial immunity should be extended to guardians ad litem under certain circumstances; but we agree with Judge Apodaca that there are other circumstances in which a guardian ad litem, like any other attorney appearing in an action, is not entitled to claim any immunity for his or her actions. We do not take the approach advocated by Judge Donnelly—providing limited or qualified immunity when the guardian acts with only ordinary negligence but not when his or her actions constitute wilful misfeasance, fraud or gross negligence—because we agree with Judge Bivins that the tenuous distinction between ordinary and gross negligence is unworkable in this setting and runs counter to other generally applicable policies, such as those holding other fiduciaries (like general guardians and conservators and including retained counsel) liable for ordinary negligence.

 We hold that a guardian ad litem, appointed in connection with court approval of a settlement involving a minor, is absolutely immune from liability for his or her actions taken pursuant to the appointment, provided that the appointment contemplates investigation on behalf of the court into the fairness and reasonableness of the settlement in its effect on the minor. We also hold, however, that if the guardian's appointment does not contemplate actions on behalf of the court but instead representation of the minor as an advocate, or if the guardian departs from the scope of appointment as a functionary of the court and instead assumes the role of a private advocate for the child's position, then the guardian is not immune and may be held liable under ordinary principles of malpractice.

In this case there is a sharp factual dispute between the parties regarding the role Tabet was initially appointed to perform and how he discharged that role. Tabet contends that he functioned at all times as the agent of the court for purposes of investigating the reasonableness of the settlement. Collins, on the other hand, argues that Tabet was appointed as a lawyer for Mikey because of a conflict of interest in which Perrine found himself and that Tabet's duties from the beginning were to act as an advocate, along with Perrine and the Hospital defendants' attorneys, in urging the court to approve the settlement. The trial court did not resolve this factual dispute. The court, however, overruled Tabet's asserted defense of immunity and submitted the question of Tabet's alleged malpractice, along with Perrine's, to the jury. We accordingly vacate the judgment and remand for a hearing on the question of the nature of Tabet's appointment and the way in which he discharged it.

## II.

At the outset, we agree with Judge Apodaca that a functional analysis should be employed in answering the question certi-

fied to us. Following the lead of the United States Supreme Court, courts around the country have agreed that the courts should adopt

> a functional approach to determining whether a guardian ad litem is absolutely immune. Under this approach, a guardian ad litem would be absolutely immune in exercising functions such as testifying in court, prosecuting custody or neglect petitions, and making reports and recommendations to the court in which the guardian acts as an actual functionary or arm of the court, not only in status or denomination but in reality.

*Gardner v. Parson,* 874 F.2d 131, 146 (3d Cir.1989). *See Westfall v. Erwin,* 484 U.S. 292, 296 n. 3, 108 S.Ct. 580, 583 n. 3, 98 L.Ed.2d 619 (1988) ("[T]his Court has long favored a 'functional' inquiry—immunity attaches to particular official functions, not to particular offices."); *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988) ("Running through our cases * * * is a 'functional' approach to immunity questions * * * [under which] we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."); *Harlow v. Fitzgerald,* 457 U.S. 800, 810–11, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982) ("[O]ur cases have followed a 'functional' approach to immunity law. We have recognized that the judicial, prosecutorial, and legislative functions require absolute immunity.").

The basic reason for recognizing the absolute immunity enjoyed by various government officials and others in discharging their official duties has been reiterated in several Supreme Court cases. It was articulated as follows in a leading decision confirming the absolute immunity of a judge who acts within his jurisdiction:

> His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

*Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).

Following this same rationale, the Supreme Court, as indicated in *Harlow,* has extended absolute immunity to various persons whose adjudicatory functions or other involvement with the judicial process have been thought to warrant protection from harassment, intimidation, or other interference with their ability to engage in impartial decision-making. *See Briscoe v. La-Hue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (witnesses in judicial proceedings); *Butz v. Economou,* 438 U.S. 478, 512–14, 98 S.Ct. 2894, 2913–15, 57 L.Ed.2d 895 (1978) (federal hearing examiner or administrative law judge); *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (state trial judge); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (state prosecuting attorney).

At least partly as a result of this extensive body of case law at the Supreme Court level, a number of courts in differing contexts have held various participants in judicial proceedings absolutely immune from liability for their actions taken in performance of their roles as "integral parts of the judicial process." *Briscoe v. LaHue,* 460 U.S. at 335, 103 S.Ct. at 1115. *See, e.g., Wiggins v. New Mexico State Supreme Court Clerk,* 664 F.2d 812 (10th Cir.1981) (members of state supreme court and clerk), *cert. denied,* 459 U.S. 840, 103 S.Ct. 90, 74 L.Ed.2d 83 (1982); *Demoran v. Witt,* 781 F.2d 155 (9th Cir.1985) (probation officer); *Burkes v. Callion,* 433 F.2d 318 (9th Cir.1970) (same and court-appointed medical examiner), *cert. denied,* 403 U.S. 908, 91 S.Ct. 2217, 29 L.Ed.2d 685 (1971); *Moses v. Parwatikar,* 813 F.2d 891 (8th Cir.) (court-appointed psychiatrist), *cert. denied,* 484 U.S. 832, 108 S.Ct. 108, 98 L.Ed.2d 67 (1987); *Howard v. Drapkin,* 222 Cal. App.3d 843, 271 Cal.Rptr. 893 (1990) (independent, court-appointed psychologist); *Seibel v. Kemble,* 63 Haw. 516, 631 P.2d 173 (1981) (same); *Babcock v. Tyler,* 884 F.2d 497 (9th Cir.1989) (social worker), *cert. denied,* —— U.S. ——, 110 S.Ct. 1118, 107

L.Ed.2d 1025 (1990); *Meyers v. Contra Costa County Dep't of Social Services,* 812 F.2d 1154 (9th Cir.) (same), *cert. denied,* 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987); *T & W Inv. Co. v. Kurtz,* 588 F.2d 801 (10th Cir.1978) (court-appointed receiver); *Kermit Constr. Corp. v. Banco Credito y Ahorro Ponceno,* 547 F.2d 1 (1st Cir.1976) (same); *Boullion v. McClanahan,* 639 F.2d 213 (5th Cir.1981) (bankruptcy trustee); *Ashbrook v. Hoffman,* 617 F.2d 474 (7th Cir.1980) (partition commissioner); *Lawyer v. Kernodle,* 721 F.2d 632 (8th Cir.1983) (pathologist assisting coroner); *Wagner v. Genesee County Bd. of Comm'rs,* 607 F.Supp. 1158 (E.D.Mich. 1985) ("friend of the court" in family court proceedings).

The principles applied in the foregoing cases have been followed in several decisions according absolute immunity to guardians ad litem in various contexts. Probably the leading such case is *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir.1984), in which the Sixth Circuit held that a guardian ad litem for a child in a dependency and neglect proceeding and a subsequent proceeding to terminate the parents' parental rights was entitled to absolute immunity. The guardian ad litem, the court said,

> must act in the best interests of the child he represents. Such a position clearly places him squarely within the judicial process to accomplish that goal. A guardian ad litem must also be able to function without the worry of possible later harassment and intimidation from dissatisfied parents.

*Id.* at 1458.

Relying on *Kurzawa,* other courts have reached similar results, holding that effective discharge of the functions of the guardians ad litem in the cases before them required that the guardians be able to operate free from the influence of the prospect of liability. *See Cok v. Cosentino,* 876 F.2d 1 (1st Cir.1989) (guardian ad litem for child in divorce proceeding involving child's custody; guardian functioned as "agent of the court"); *Gardner v. Parson,* 874 F.2d 131, 146 (dictum) (guardian ad litem for child in dependency and neglect case; guardian was arguably "an actual functionary or arm of the court"); *Myers v. Morris,* 810 F.2d 1437, 1466–67 (8th Cir.) (guardians ad litem for children in investigation of alleged sexual abuse; guardians immune from damage claims arising from performance of "delegated functions"), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *Penn v. McMonagle,* No. H–89–48 (Ohio Ct.App. October 12, 1990) (1990 WL 152126, 1990 Ohio App. Lexis 4426) (guardian ad litem for children in divorce case; appointing court requested recommendations concerning custody; guardian held immune from malpractice liability); *Short v. Short,* 730 F.Supp. 1037 (D.Colo. 1990) (guardian ad litem for children in custody dispute; guardian acting as "agent of the court" immune from malpractice liability); *Ward v. San Diego County Dep't of Social Servs.,* 691 F.Supp. 238 (S.D.Cal. 1988).[4]

In *Ward,* a father sued a guardian ad litem alleging that the latter had acted outside the scope of her authority while undertaking an investigation in connection with a dependency proceeding involving the child. The guardian had been appointed by a juvenile court judge to serve as a "Special Advocate Guardian Ad Litem"; she was a volunteer for a nonprofit organization called "Voices for Children," which operated under the supervision of the juvenile court pursuant to statute. The purposes of Voices for Children was to facilitate the movement of dependent minors from temporary placement to permanent homes by providing volunteers to serve as guardians ad litem, who then conducted

---

**4.** The modern cases ruling on a guardian ad litem's immunity appear to be uniform in holding that the guardian is immune. There are, however, dicta and at least one holding in older cases to the effect that a guardian ad litem is liable for ordinary negligence in failing to protect the interests of the ward. *See Speck v. Speck,* 42 Ga.App. 517, 156 S.E. 706 (1931); *County of Franklin v. Jones,* 245 N.C. 272, 279, 95 S.E.2d 863, 868 (1957) (dictum); *Travis v. Johnston,* 244 N.C. 713, 722, 95 S.E.2d 94, 100 (1956) (dictum); *In re Jaeger's Will,* 218 Wis. 1, 10–11, 259 N.W. 842, 846 (1935) (dictum). *See also Dixon v. United States,* 197 F.Supp. 798, 802–03 (W.D.S.C.1961) (dictum).

factual investigations and made recommendations to the court regarding the placement which was thought to be in the child's best interests. The order appointing the guardian ad litem provided that she would have access to all of the child's records, would be given notice of and be authorized to attend all conferences and hearings regarding the child, and would "investigate and report to the court such information as would assist this child in obtaining a permanent home." 691 F.Supp. at 240. The court said:

> As guardian ad litem, [the guardian] was *acting as an extension of the court* by performing the quasi-judicial functions of investigating the facts and reporting to the court what placement was in [the child's] best interests.
>
> * * * A guardian ad litem serves to provide the court with independent information regarding the placement or disposition which is in the best interests of the child. This independent determination is crucial to the court's decision. The threat of civil liability would seriously impair the ability of the guardian ad litem to independently investigate the facts and to report his or her findings to the court. As a result, *the ability of the judge to perform his or her judicial duties would be impaired* and the ascertainment of truth obstructed.

*Id.* (emphasis added).

Most of the cases cited thus far in this opinion were federal civil rights cases holding defendants immune from liability under 42 U.S.C. Section 1983 (1988). The law relating to the quasi-judicial immunity of functionaries like guardians ad litem has thus developed in recent decades in a context different from the malpractice setting of the present lawsuit, but we see no reason why the basic principles applicable in the civil rights context should not apply in adjudicating a guardian ad litem's liability for negligence.

One recent decision in the malpractice context is *Tindell v. Rogosheske,* 421 N.W.2d 340 (Minn.Ct.App.), *aff'd,* 428 N.W.2d 386 (Minn.1988), in which the Minnesota Court of Appeals held that a guardian ad litem in a paternity and child support action was absolutely immune for his approval, allegedly negligent, of a settlement of the father's child support obligations. Relying on *Briscoe v. LaHue* and *Kurzawa,* the court said:

> Judicial immunity, originally developed to preserve the autonomy and integrity of the judiciary, has been extended to quasi-judicial officers. This extension rests on the theory that persons who are integral to the judicial process must be able to perform their functions without the intimidating effect of potential lawsuits.

421 N.W.2d at 341 (citations omitted).

The guardian ad litem in *Tindell* was sued for failing to investigate the reasonableness of a settlement. The case therefore stands as a closely applicable precedent in the instant appeal. The nature of the settlement, however, and, more importantly, the nature of the guardian's appointment were different from those in the present case. There, the guardian was appointed to represent the interests of a minor in an action for child support brought by a governmental agency against the purported father. The appointment thus was similar to those in *Cok v. Cosentino* and *Gardner v. Parson.* Here, the action was brought by the minor himself against alleged tortfeasors; the appointment was procured by the attorney for the minor, and the extent of the court's involvement with the appointment—the extent of delegation of the court's responsibilities and the degree to which Tabet was intended to function as an "agent of the court"—is uncertain.

█ We have no difficulty holding that if Tabet did carry out his responsibilities as an "arm of the court," assisting the court in determining the reasonableness of the settlement reached by Perrine and the attorneys for the Hospital defendants, Tabet is absolutely immune from liability for the negligence which the jury found. The objectivity of a guardian's investigation and recommendation might be compromised by the threat of liability; and, as the court held in *Ward,* this could impair the judge's

own ability to perform his or her judicial duties in approving the settlement.

But we are unwilling to rule as a matter of law that Tabet's appointment invested him with court-like responsibilities and that his discharge of those responsibilities remained within the scope of such an appointment. We believe, moreover, that a guardian ad litem who is *not* acting as a "friend of the court"—assisting the court in determining the reasonableness of the settlement—is not entitled to immunity. Where the guardian ad litem is acting as an advocate for his client's position—representing the pecuniary interests of the *child* instead of looking into the fairness of the settlement (for the child) on behalf of the *court*—the basic reason for conferring quasi-judicial immunity on the guardian does not exist. In that situation, he or she functions in the same way as does any other attorney for a client—advancing the interests of the client, not discharging (or assisting in the discharge of) the duties of the court. While the threat of civil liability may deter the guardian in various ways, the same can be said of the effects of the similar threat with which all attorneys appearing in lawsuits are faced. It is to these considerations that we now turn.

## III.

▆ First, we examine more closely the nature of Tabet's appointment. As noted previously, the parties take sharply differing positions on this issue. The source of the court's power to appoint a guardian ad litem for Mikey is not clearly identified by Tabet, though there is some intimation that the appointment may have been made pursuant to NMSA 1978, Sections 38–4–10 to –16, NMSA 1978 (Repl.Pamp.1987).[5] Collins argues strenuously that Tabet was appointed under SCRA 1986, 1–017(C), which provides in part:

> C. *Infants or incompetent persons.*
> \* \* \* If an infant or incompetent person does not have a duly appointed representative he may sue by his next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

Collins maintains that after the settlement had been negotiated, Perrine could no longer represent both Mikey and his parents because a conflict of interest had arisen between the parents and their son over division of the settlement proceeds. At that point, Collins argues, Mikey was "not otherwise represented" in the suit against the Hospital defendants, and so a guardian ad litem had to be appointed to represent his separate interests.

Just as we cannot resolve the question of the nature of Tabet's appointment as a matter of law, neither can we resolve, on this record, the dispute over whether he was appointed (as Collins argues) as a "conflict lawyer/guardian ad litem" to represent Mikey's interest in the settlement. As Tabet rather persuasively argues, it appears that all of the settlement proceeds were to go either to Perrine or for Mikey's

---

**5.** Judge Donnelly, in his separate opinion on the question certified, assumed that Mikey's settlement with the Hospital defendants was approved pursuant to Section 38–4–16, which authorizes a guardian ad litem for an incapacitated person to enter into a compromise in an action for or against his ward, subject to court approval. However, "incapacitated person" is defined in Section 38–4–14 as excluding minors. Sections 38–4–14 through –17 were enacted by N.M.Laws 1925, Chapter 22, and deal with guardians ad litem for incapacitated persons other than minors. Sections 38–4–7 through –12 originated in N.M.Laws 1897, Chapter 73, and deal generally with guardians ad litem appointed to defend actions against minors or "infants." These sections do not expressly authorize appointment of a guardian ad litem for an infant plaintiff, and no other statute either authorizes or requires court approval of a settlement by a child, with or without representation through a guardian ad litem. *See generally Garcia v. Middle Rio Grande Conservancy Dist.,* 99 N.M. 802, 808, 664 P.2d 1000, 1006 (Ct.App.), *cert. denied,* 99 N.M. 740, 663 P.2d 1197 (1983). We have no doubt that the court has power, either inherent or express under SCRA 1986, 1–017(C), to appoint a guardian ad litem for a minor plaintiff, whether or not the child is "otherwise represented." When such an appointment is made, however, the duties of the guardian, since they are not defined by statute, will, if not specified by the court, remain unclear and may well vary from case to case.

benefit, so perhaps there was no real conflict; the suit was brought on Mikey's behalf by his parents as "next friends," and Perrine may not have been disqualified from representing both them and Mikey. But if that is so, why did the attorneys in the suit believe that appointment of a guardian ad litem was necessary to secure court approval?

Part of the answer to this question was provided by our court of appeals in *Garcia v. Middle Rio Grande Conservancy District*, 99 N.M. at 808, 664 P.2d at 1006, as follows:

> In suits involving children, the traditional distinction between a next friend and a guardian *ad litem* is that the former undertakes to prosecute a suit in the name and on behalf of an infant plaintiff, whereas a guardian *ad litem* is appointed by the court to defend a suit against a minor defendant.
>
> The general rule is that a next friend or guardian *ad litem* acting for a minor may negotiate a compromise or settlement, but such compromise or settlement is not binding on the infant in the absence of judicial approval. [Citations omitted.]

Collins asserts, and we have no reason to doubt, that it is the general practice in New Mexico for a guardian ad litem to be appointed to represent the interests of a minor in any proceeding to secure court approval of a settlement involving the minor.

█ And there's the rub. For it is clear that in New Mexico, and probably elsewhere, a guardian ad litem *does* represent the interests of his or her ward, but the guardian may at the same time assist the court in carrying out *its* duty of protecting the interests of the child. It is, of course, thoroughly settled in this state that "a minor in court is represented not only by the guardian ad litem, but by the court itself." *Bonds v. Joplin's Heirs*, 64 N.M. 342, 344, 328 P.2d 597, 599 (1958); *Haden v. Eaves*, 55 N.M. 40, 47, 226 P.2d 457, 462 (1950); *Garcia*, 99 N.M. at 808, 664 P.2d at 1006; *Wasson v. Wasson*, 92 N.M. 162, 163, 584 P.2d 713, 714 (Ct.App.1978). The guardian ad litem thus may fulfill the dual

role of providing information to the court to enable it to pass on the reasonableness of a settlement, while at the same time protecting the ward's interests by zealous advocacy and thorough, competent representation. *See also duPont v. Southern Nat'l Bank of Houston, Texas*, 771 F.2d 874 (5th Cir.1985), *cert. denied*, 475 U.S. 1085, 106 S.Ct. 1467, 89 L.Ed.2d 723 (1986). *See also Bonds*, 64 N.M. at 345, 328 P.2d at 599:

> [A]ppointment as guardian ad litem of a minor is a position of the highest trust and no attorney should ever blindly enter an appearance as guardian ad litem and allow a matter to proceed without a full and complete investigation into the facts and law so that his clients will be fairly and competently represented and their rights fully and adequately protected and preserved.

█ The proposition in *Bonds* that a guardian ad litem occupies a position of the highest trust suggests that he or she is a fiduciary. Judge Donnelly, in expressing his views on the question certified to us, analogized the position of the guardian ad litem to that of a general guardian or conservator under NMSA 1978, Sections 45–5–312 and –401 (Repl.Pamp.1989). Fiduciaries, of course, are subject to liability to their wards for harm resulting from ordinary negligence in the discharge of their fiduciary duties; if anything, they are charged with a *higher* standard of care than are persons who do not owe fiduciary duties. *See Pino v. Budwine*, 90 N.M. 750, 568 P.2d 586 (1977); *Estate of Guerra v. New Mexico Human Services Dep't*, 96 N.M. 608, 633 P.2d 716 (Ct.App.1981) (guardian accepting assets of ward held to stringent and high standards of conduct). And, of course, an attorney is liable for his or her ordinary negligence in the representation of the client. *First Nat'l Bank of Clovis v. Diane, Inc.*, 102 N.M. 548, 698 P.2d 5 (Ct.App.1985).

Although a guardian ad litem sometimes must fulfill these dual responsibilities, it is clear that in some circumstances a guardian's primary or even sole function is to represent his or her ward in the same way

that a retained attorney represents his or her client. For example, in *Veazey v. Veazey*, 560 P.2d 382 (Alaska 1977), the court, while recognizing the guardian's dual roles in the child custody dispute before it, concluded that

a guardian ad litem appointed pursuant to [general statute authorizing appointment of guardians] is in every sense the child's attorney, with not only the power but the responsibility to represent his client zealously and to the best of his ability. Like any other attorney he should, upon appointment, investigate the facts thoroughly * * * [and] should exercise his best professional judgment on what disposition would further the best interests of the child, his client, and at the hearing vigorously advocate that position before the court.

\* \* \* \* \* \*

[W]hen a child needs a guardian ad litem, he needs an advocate—someone who will plead *his* cause as forcefully as the attorneys for each competing custody claimant plead theirs. The basic premise of the adversary system is that the best decision will be reached if each interested person has his case presented by counsel of unquestionably undivided loyalty.

*Id.* at 387, 390 (citations omitted). *See also de Montigny v. de Montigny*, 70 Wis.2d 131, 141, 233 N.W.2d 463, 468–69 (1975):

The guardian *ad litem* is more than an adjunct to the court. He is the attorney for the children and their interests. He must perform his duties in accordance with the standards of professional responsibility adopted by this court. Nominal representation that fails to assure that children are treated as parties to the action is insufficient and constitutes a breach of the duties of professional responsibility.

In *Kurzawa*, the court in extending absolute immunity to the guardian ad litem commented that "[a] failure to grant immunity would hamper the duties of a guardian ad litem in his role as an advocate for the

child in judicial proceedings." 732 F.2d at 1458. The court's seemingly blanket extension of immunity to all guardians ad litem, no matter what their functions in particular cases, was criticized in *Gardner v. Parson, supra*, which noted: "If the court means by this that the guardians capacity as an *advocate* alone confers absolute immunity, we cannot agree." 874 F.2d at 145, n. 21.

■ We likewise are unwilling to envelope all guardians ad litem with absolute immunity, no matter what their functions in a particular case. Where the guardian's functions embrace primarily the rendition of professional services in the form of vigorous advocacy on behalf of the child, the reason for the protection of immunity—avoiding distortion of the investigative help and other assistance provided to the court—is lacking, and the attorney rendering professional service to the child should be held to the same standard as are all other attorneys in their representation of clients.

At least one court has adopted this basic rationale in holding that a public defender is not entitled to official immunity in a suit for negligent representation. In *Reese v. Danforth*, 486 Pa. 479, 486, 406 A.2d 735, 739 (1979), the court explained:

While the availability of court-appointed counsel to represent indigents is indubitably the public business, we hold that once the appointment of a public defender in a given case is made, his public or state function ceases and thereafter he functions purely as a private attorney concerned with servicing his client. His professional relationship with his client takes on all the obligations and protections attendant upon a private attorney-client relationship except one: the public pays his fee. In this respect, he is like the physician rendering professional services which are paid for out of public funds and, like that physician, he ought to be subject to liability for tortious conduct.[6] [Citations omitted.]

6. *Cf. Polk County v. Dodson*, 454 U.S. 312, 318, 102 S.Ct. 445, 449, 70 L.Ed.2d 509 (1981) (public defender does not act under color of state law

when performing lawyer's traditional functions as counsel to indigent defendant; adversarial system "posits that a defense lawyer best serves

Of course, in New Mexico the legislature has decided that a public defender shall not be liable for the performance or nonperformance of his or her services. *See* NMSA 1978, § 31–16–10 (Repl.Pamp.1984). If there are public policy reasons to grant immunity to guardians ad litem who function primarily as advocates rather than as court assistants, such as the apprehension that private attorneys will be unwilling to accept guardian ad litem appointments, then a legislative grant of immunity might well be warranted. *Cf. Westfall v. Erwin,* 484 U.S. 292, 300, 108 S.Ct. 580, 585, 98 L.Ed.2d 619 (1988) (Congress in best position to provide guidance into whether immunity is warranted in particular context; legislated standards governing immunity of federal employees in state-law court actions "would be useful").

We do not mean to suggest that a guardian ad litem who fulfills primarily an advocate's role will not under any circumstances be entitled to some form of immunity. Considerations favoring immunity might well be present when a guardian ad litem is appointed, for example, under SCRA 1986, 10–305(D), to represent a child alleged to be abused or neglected, or under NMSA 1978, Section 40–4–8 (Repl.Pamp. 1989), to represent minor children in a custody dispute. Such considerations might include the availability of attorneys or others to act on behalf of such children, the source and extent of their compensation,[7] the extent to which the threat of liability would impede them in the performance of their duties, and probably others. We hold only that an attorney who is privately retained as a guardian ad litem to advocate approval of a settlement in an action by the child to recover damages is not entitled to quasi-judicial immunity. The reasons for such immunity do not extend to an attorney representing a private interest who is not assisting the court in the discharge of its judicial duties.

## IV.

We have held that if Tabet was appointed and performed as an "arm of the court," he is absolutely immune, but that if his appointment only established him as another attorney for Mikey to advocate court approval of the settlement, or if, although he was appointed to assist the court, he stepped out of that role and became a private advocate, then he is not immune. Which of these characterizations best describes the nature of Tabet's appointment and how he actually functioned? And who is to make that characterization—this Court, the trial judge or the jury?

As this opinion has indicated, we believe the issue is essentially a factual one. While it is often said that the applicability of immunity defenses is a question of law, *e.g., Melton v. Oklahoma City,* 879 F.2d 706, 726 (10th Cir.1989) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)), that statement is usually made in the context of an issue not present here—the determination of whether a defendant subject to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), knew or should have known that his conduct would violate a clearly established statutory or constitutional norm. *E.g., Warren v. City of Lincoln,* 816 F.2d 1254, 1261 (8th Cir.1987) (quoting *Llaguno v. Mingey,* 763 F.2d 1560, 1569 (7th Cir.1985) (issue of immunity—whether law appeared to authorize defendant's misconduct—is issue of law to be decided by judge)). However, even in that context, courts have indi-

the public, not by acting on behalf of the State or in concert with it, but rather by advancing 'the undivided interests of his client.' "); *Meeker v. Kercher,* 782 F.2d 153, 155 (10th Cir.1986) (guardian ad litem in abuse and neglect proceeding under New Mexico law does not act under color of state law, because he or she exercises independent, professional judgment).

**7.** In this case (as in similar cases), Tabet was compensated out of the settlement proceeds.

Often a guardian ad litem will be compensated from the ward's resources, *see Bonds v. Joplin's Heirs,* 64 N.M. at 346, 328 P.2d at 600; and in such cases there is more reason to hold that the guardian is functioning in a capacity similar to that of a private attorney than there is in cases when he or she is compensated by, for example, both parents in a custody dispute, *see* Section 40–4–8, or from public funds, or is a volunteer.

cated that the issue of immunity properly could be submitted to the jury. *See Benigni v. City of Hemet,* 879 F.2d 473 (9th Cir.1988); *Ngiraingas v. Sanchez,* 849 F.2d 372 (9th Cir.1988); *cf. Westfall v. Erwin,* 484 U.S. at 292, 299, 108 S.Ct. at 580, 585 ("A material issue of fact thus exists as to whether petitioners exercised sufficient discretion in connection with the alleged tort to warrant the shield of absolute immunity.").

In cases involving whether prosecutors may properly claim immunity for acts taken in the performance of their duties, courts are faced with issues of characterization not unlike that to be decided in determining whether Tabet is entitled to claim immunity in this case. As the Supreme Court determined in *Imbler v. Pachtman, supra,* prosecutors are entitled to absolute immunity for conduct which may be characterized as "prosecutorial," while they generally enjoy only qualified immunity for acts taken in an administrative or investigative capacity. *See Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Auriemma v. Montgomery,* 860 F.2d 273 (7th Cir.1988). In *In re Scott County Master Docket,* 618 F.Supp. 1534 (D.Minn.1985), *aff'd in part and rev'd in part sub nom. Myers v. Morris,* 810 F.2d 1437 (8th Cir.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987), the court recognized that the characterization of the prosecutor's acts depended upon an analysis of the facts involved. The court said:

> The determination of whether a prosecutor's actions were prosecutorial or investigatory sometimes requires a *limited factual inquiry.* Of course, permitting a factual inquiry on the issue of whether actions were prosecutorial or investigatory dilutes somewhat the protection of prosecutorial immunity, but this dilution may be necessary in some cases.

618 F.Supp. at 1553 (emphasis added) (citing *Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir.1979) ("[T]his approach is necessary to protect fully the government official performing a protected function; at the same time, we must permit a private remedy to those whose constitutional rights were violated by an official acting outside the scope of absolute immunity."), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981)).

█ Similarly, in this case, a limited factual inquiry is necessary to determine the nature of Tabet's appointment and the extent to which he functioned within the scope of that appointment. This approach provides Tabet the protection to which he is entitled if he acted in a quasi-judicial capacity, but at the same time permits a private remedy to Mikey Collins to the extent his rights were violated by Tabet's negligence if he was not entitled to claim absolute immunity. "Immunity from damages, whether absolute or qualified, represents a sharp departure from the principle that persons are responsible for the harm they inflict upon one another, and that the victims may seek compensation from the perpetrators." *Mason v. Melendez,* 525 F.Supp. 270, 275 (W.D.Wis.1981) (discussing extensively allocation of fact-finding function as between judge and jury in deciding question of immunity from damages).[8] Absolute immunity will be "extended no further than its justification would warrant." *Harlow v. Fitzgerald,* 457 U.S. at 811, 102 S.Ct. at 2734. It is an affirmative defense, and the burden of proving it lies with the person asserting it. *Id.* at 815, 819, 102 S.Ct. at 2736, 2738.

This is not to say that the trial judge, and this Court on review, do not have important roles to play in assuring that the purpose of the immunity defense is not emasculated by subjecting the person claiming it to the hazards of a trial in every case. Where the facts are clear, summary judgment is an important safeguard in preventing frivolous or harassing suits, *Har-*

8. The court in *Mason* added this pertinent comment: "The entire matter of the allocation of the fact-finding function as between judge and jury in an action for damages must be viewed against the backdrop of the Seventh Amendment right to trial by jury." 525 F.Supp. at 281. In New Mexico, of course, the right to trial by jury is confirmed in Article II, Section 12, of our state Constitution.

*low,* 457 U.S. at 815–19, 102 S.Ct. at 2736–39; and trial judges should not hesitate to grant directed verdicts and otherwise perform their function of deciding issues of law in appropriate cases. In some cases, fact issues may be resolved by submitting special interrogatories to the jury under SCRA 1986, 1–049, and the trial judge can then pass on the applicability of the immunity defense in light of the jury's answers. In all cases, the trial judge should be vigilant to guard against dilution of the purpose of the defense through unjustified exposure of the defendant to the burdens and risks of a trial.

In this case, however, certain basic fact questions cry out for resolution before Tabet can be said to have carried his burden of proof that he is immune from liability for malpractice. For example, in appointing Tabet as guardian ad litem for Mikey in the suit against the Hospital defendants, did the court (Judge Maloney) intend that he should investigate the reasonableness of the settlement on behalf of the court and provide his best professional opinion as to that question? Or did the court simply rubber-stamp an appointment submitted to it by Perrine and the Hospital defendants' attorneys, who expected Tabet to urge approval of the settlement as "fair and reasonable"? Why and how did Perrine engage Tabet as guardian ad litem, and what was the basis on which Tabet was to be compensated? Did Perrine feel that he was caught in a conflict of interest so that he could not properly represent Mikey in connection with the settlement, and was Tabet engaged to alleviate this conflict of interest? Tabet testified in a deposition before trial that his only function was to affirm the settlement, that he did not have authority to reject it, and that he was just there "to make sure that superficially everything was in order." Collins's brief

states that, at trial, Tabet recanted much of his deposition testimony.

This is the classic kind of conflict for resolution by a jury. On remand, the jury should, perhaps under the guidance of carefully framed special interrogatories from the judge, answer questions similar to the foregoing [9] in order to decide, under appropriate instructions, whether or not to give Tabet the benefit of the defense of absolute immunity.

### V.

There remain for resolution the other issues raised by Tabet on this appeal.[10] Having addressed at some length the question certified, we answer summarily the remaining questions listed in the court of appeals' opinion in *Collins v. Perrine, supra,* 108 N.M. at 715, 778 P.2d at 913.

The first of the remaining questions is: "As guardian, was Tabet a public employee within the meaning of the Tort Claims Act, NMSA 1978, Sections 41–4–1 to 41–4–29 (Repl. [Pamp.] 1986) (the Act)?" Judge Apodaca, in his opinion in connection with the question certified, also dealt with this question of immunity under the Tort Claims Act and answered it in the negative. We agree with this answer, because—whether or not Tabet was, as he contends, "acting on behalf of the trial court" in functioning as a guardian ad litem—he was not a "public employee" as defined in Section 41–4–3(E)(3). We note that Judge Donnelly, in his separate opinion on the question certified, likewise concluded that Tabet was not a public employee.

The next three questions listed on appeal relate to whether the defendants, Perrine and Tabet, breached their respective duties as guardian ad litem and attorney, whether their respective negligence

---

**9.** We do not intimate that the questions just posed would be appropriate for the court's special interrogatories, if the court chooses to give some. The questions to the jury, if any, will have to be carefully drawn in light of the legal principles set out in this opinion and in light of the specific factual issues that emerge from the evidence.

**10.** Our jurisdiction following certification under Section 34–5–14(C) extends to "matters appealed to the court of appeals, but undecided by that court," if the court makes the requisite certification. We construe the word "matter" to mean the entire case in which the appeal is taken.

was a proximate cause of plaintiffs' damages, and whether recovery was permissible notwithstanding the doctrine of finality of settlement. These questions were answered in the affirmative as to Perrine, 108 N.M. at 716–19, 778 P.2d at 914–17; and we reach the same conclusion as to Tabet, for essentially the reasons set out in the court of appeals' opinion.[11]

■ We also hold that the trial court did not err in denying a remittitur of the jury award, again for the reasons specified in the court of appeals' opinion, *id.* at 719–21, 778 P.2d at 917–19.

One issue raised by Tabet but not by Perrine is the contention that the trial court erred in refusing to allow Judge Maloney to testify. Tabet sought to call the judge, who appointed Tabet and approved the settlement, as a witness to testify as to his intent in appointing Tabet and his expectations of the guardian ad litem in evaluating the settlement. Collins objected, and the trial court refused to permit Judge Maloney to testify.

Judge Apodaca, in his separate opinion on the question certified, proposed to hold that the trial court did not abuse its discretion in refusing Judge Maloney's testimony. We have no occasion to disturb this ruling, because retrial of the issue is necessary in any event, and the factors to be considered by the trial court in exercising its discretion should the question arise again might well be regarded in a different light by the court. In view of the considerations we have set out earlier in this opinion, the court on retrial might well decide to permit Judge Maloney to testify. The policy considerations against calling a presiding judge as a witness in a case over which he has presided are still pertinent, but they may be evaluated differently when the issue is retried. We leave the question of whether Judge Maloney, or any other witness, should testify where it belongs—in the sound discretion of the trial court. *See United States v. Troutman,*

814 F.2d 1428, 1439–40 (10th Cir.1987); *State v. Lopez,* 105 N.M. 538, 547, 734 P.2d 778, 786 (Ct.App.1987).

The judgment is vacated and the cause remanded to the district court with instructions to determine whether Tabet was entitled to absolute immunity under the principles set out in this opinion. In the event it is determined that he was immune, then judgment shall be entered in his favor. In the event it is determined that he was not, then the judgment previously entered shall be reinstated.

IT IS SO ORDERED.

SOSA, C.J., and FRANCHINI, J., concur.

BACA, J., dissenting.

RANSOM, J., not participating.

BACA, Justice (dissenting).

Although I find Justice Montgomery's opinion thorough and intriguing, I feel I must respectfully dissent. I would cloak the guardian ad litem in judicial immunity. Through this opinion, the majority chips away at the independence of the judiciary (a doctrine that has been respected since the early days of our government) by limiting the immunity of judges and those who operate under judicial authority, and it severely limits the ability of guardians to pursue the tasks to which they are appointed. The significance of this case to the judicial branch should not be underestimated.[1]

Absolute judicial immunity was "solidly established at common law." *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Judicial immunity is not for the benefit of individual judges, *"but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence, and without fear of consequences." Bradley v. Fisher,* 80 U.S. (13

---

11. As to Tabet's breach of duty—his professional negligence or malpractice—see note 3, *supra.*

1. As noted by Justice Montgomery, this case is before us on certification from the court of appeals. I am basically in accord with the view expressed by Chief Judge Bivins as expressed in his separate unreported opinion, and agree with his advocacy of absolute immunity.

Wall.) 335, 350 n. +, 20 L.Ed. 646 (1871) (citations omitted).[2] It hardly bears repeating that New Mexico has a long-standing tradition of judicial independence that directly relates to our responsibility to the people of New Mexico. *See* N.M. Const. Art. II, § 18; *State ex rel. Anaya v. Scarborough,* 75 N.M. 702, 410 P.2d 732 (1966); *State v. Morris,* 75 N.M. 475, 406 P.2d 349 (1965). In *Bradley,* in addition to the long-standing common law tradition, the Court articulated three policies that support judicial immunity: (1) the need for judicial independence and freedom from potentially coercive suits, *id.* at 80 U.S. (13 Wall.) 347; (2) the burden on judges and the judiciary, and the degradation to the judicial office, created when a judge is forced to defend a judicial decision in a collateral legal attack, *id.* at 349; and (3) the infringement on the principle of judicial finality. *Id.* These policies requiring judicial immunity are directly implicated by, and justify, the extension of absolute immunity to a guardian ad litem under the facts and circumstances as presented to us in the case at bar.

As the majority properly points out, the court, in the first instance, bears the responsibility to represent the interests of a minor in court. *See* at 400, 806 P.2d at 49. The majority also properly notes that the authority to appoint a guardian ad litem, at least in circumstances such as are presented to us in this case, arises either from the court's inherent authority or from SCRA 1986, 1–017(C), which, of course, is a rule promulgated by this court pursuant to our constitutional authority and responsibility to exercise our power of superintending control. *See* N.M. Const. art. VI, § 3; *Ammerman v. Hubbard Broadcasting, Inc.,* 89 N.M. 307, 551 P.2d 1354 (1976). In other words, the authority to appoint a guardian ad litem is purely judicial and is vested with judicial discretion. It is also well-settled that a judge or judicial officer, acting within the appropriate jurisdiction, is granted immunity. *Vickrey v. Dunivan,* 59 N.M. 90, 279 P.2d 853 (1955); *see Wiggins v. New Mexico State Supreme Court Clerk,* 664 F.2d 812 (10th Cir.1981) (affirming judicial immunity extended to court clerks), *cert. denied,* 459 U.S. 840, 103 S.Ct. 90, 74 L.Ed.2d 83 (1982).[3]

In *Haden v. Eaves,* 55 N.M. 40, 226 P.2d 457 (1950), this court resolved an issue that, I believe, essentially is dispositive of the instant case. We considered whether a minor, represented by a guardian at trial, could assert error on appeal, although the guardian ad litem had not preserved properly objections below. To resolve that issue, we adhered to the weight of authority and held: "a minor who has a case in court is represented not only by his guardian ad litem, but by the court itself. A guardian ad litem is an arm of the court whose function is to protect the ward, and a court must not permit its arm to strangle him." *Id.* at 47, 226 P.2d at 462. Thus, we recognized then what the court has partially repudiated today—that the primary and ultimate responsibility for the welfare of a child appearing before a New Mexico court lies with the court. The court can appoint a guardian ad litem to assist it, assigning its responsibility derivatively to authorize the guardian to assist the child and thereby the court in overseeing a settlement. By this action, however, the court has not, and cannot, relinquish its responsibility. I believe that the immunity that cloaks the court in its pursuit of this judicial obligation must also protect the guardian when it assists the court. By not extending immunity to guardians, this court diminishes its own immunity by allowing litigants to circumvent it.

---

**2.** *See also Ryan v. Scoggin,* 245 F.2d 54, 58 (10th Cir.1957) ("That deep-seated fundamental rule of ancient origin and frequent repetition rests upon considerations of public policy that such immunity is a concomitant of an independent judiciary which is indispensable to the well-being of a free people."); *Edwards v. Wiley,* 70 N.M. 400, 374 P.2d 284 (1962) (upholding immunity of justice of peace).

**3.** In *Wiggins,* the tenth circuit recognized that immunity for court clerks was necessary to allow the clerks to perform their duties and to allow judges to function without the threat of collateral attack that would circumvent judicial immunity. 664 F.2d at 815.

This cloak of immunity has been extended to other judicial officials when they act to assist the court in its judicial role. *See Wiggins*, 664 F.2d at 815; maj. at 396–397, 806 P.2d at 45–46. Extension of immunity to a guardian ad litem (operating as was Tabet) is necessary, not only to fit within our precedent, and not only to prevent the erosion of the court's immunity, but also to allow a guardian such as Tabet to do what the court has asked of him. *See Tindell v. Rogosheske*, 428 N.W.2d 386, 387 (Minn.) ("The guardian's duty is to act within the course of that judicial proceeding in furtherance of the best interests of the child.... A guardian must be free, in furtherance of the goal for which the appointment was made, to engage in a vigorous and autonomous representation of the child. Immunity is necessary to avoid harassment from disgruntled parents who may take issue with any or all of the guardian's actions."), *aff'g* 421 N.W.2d 340 (Ct.App.) (1988).[4]

An analysis of the role that Tabet was asked to perform demonstrates why immunity should be granted in this case. I disagree with the majority's characterization of his role (in Section III of its opinion) that guides their decision not to decide this issue as a matter of law. I also disagree with the basis for the majority's distinction of *Tindell*. *See* at 398, 806 P.2d at 47. The majority distinguished *Tindell*, which granted absolute immunity, because the guardian had been appointed to represent the minor in an action by a government agency against the father for support, whereas here the minor brought the action himself. If anything, I believe *Tindell*

presents a stronger case for not granting immunity to the guardian. In *Tindell* (and cases cited therein), the guardian was appointed as the sole representative of the child, whose rights were affected by litigation involving his parents and a government entity, with the responsibility to advise whether a settlement was in the best interests of the child. The majority intimates by way of distinguishing the instant case that the appointment of Tabet was collusive or at least was done without the court's full involvement; thus the majority lays the foundation to determine that Tabet may not have received a delegation of the court's authority to the extent that he could be defined as an agent of the court. This distinction is irrelevant. It ignores what I believe is the custom in our courts (as I argue later, this is a further reason why this is not a proper question to place before the jury). A judge does not sit by with a list of possible guardians, but in this—as in most matters before it—relies on the assistance of the attorneys representing the parties. Moreover, to the extent that Mikey's attorney, Perrine, helped procure or recommended Tabet as a possible guardian ad litem, this could only have been to assist the court in furthering its own role—to safeguard the minor's welfare.

In this case, Mikey already was represented by retained counsel. It would be anomalous to expect the guardian ad litem—even if, as claimed by Collins, he was appointed to represent Mikey because of a conflict of interest arising by virtue of the division of the settlement *between Mikey*

---

**4.** This raises a fundamental question: if the court is not required to appoint a guardian, and if the court bears the ultimate responsibility for the welfare of the child, why should the court bother to appoint a guardian at all, especially if, as has been alleged here, the guardian may pursue the task negligently? This question may be even more relevant in the aftermath of this opinion, when the appointment of a guardian ad litem potentially may subject the court and its approval of a settlement to collateral attack. Although the court would retain its immunity, the collateral attack on the decision through a suit against the guardian reduces the finality of the court's decision and may interfere with the judicial process by subjecting the court to sec-

ond guessing and placing the judge in the position where he or she may be forced to testify in the collateral suit as to the scope of the appointment and to defend his or her choice of appointment. The appointment of a guardian is, of course, a matter committed to judicial discretion. The district courts may consider, however, whether in all cases an appointment is warranted under the circumstances, and, in fact, the effect of today's opinion may well be to force the responsibility for the minor's welfare back to the courts without assistance when the courts find a scarcity of attorneys willing to accept the potentially limitless exposure to liability in exchange for the paltry sums received as compensation.

*and his parents*—to intercede in the negotiations and settlement arrived at by Mikey and his parents *as represented by Perrine* on one side and the hospital on the other. Tabet was appointed to determine whether the settlement was in the best interest of the minor as against his parents (the arena in which the potential conflict arose), not to negotiate the settlement on behalf of Mikey or determine whether the amount of the settlement was fair as against the hospital. Perrine presumably had spent the majority of his efforts in representing Mikey and his parents arriving at that settlement. Perrine had a full awareness of their needs, their bargaining position, and their strategy (which may have included their expectation of future litigation for which a "war chest" may have been needed). We may only speculate as to why Perrine arrived at this settlement in the first place, *but so only could* Tabet. Tabet was not a participant from the outset as was Perrine. He only came in—*as would the court*—at the culmination of the proceedings, when the reasonableness of the settlement was at issue before the court. Tabet was vested with limited authority derived from the court. He examined the settlement—made between two fully represented parties—to determine that the child's interest and welfare were considered. He was not armed with the arsenal available to an attorney representing a party—as was the court, he was not authorized to take depositions or independently determine the facts. He was bound by what the parties presented, with only the power to determine the settlement's reasonableness. By not extending judicial immunity to guardians, we are altering their limited role and requiring them to go beyond the role assumed by the court to not only examine a settlement to see that it reasonably considers the minor's welfare, but also to second guess the attorneys and the parties who arrived at the settlement. Even then, the guardian would be subject to potential collateral suit for too vigorous-

ly inserting himself into the role of advocate, should the litigation proceed to the detriment of the minor. *Cf. Kurzawa v. Mueller*, 732 F.2d 1456 (6th Cir.1984) (guardian sued based on overzealous representation of minor's interest in custody suit).

The majority opinion distinguishes, for the purposes of granting immunity, between whether the guardian ad litem functions as a true arm of the court by assisting the court to carry out its duty to protect the interests of the child, or whether the guardian acts as a representative of the ward. It concludes that, in some instances, "a guardian's primary or even sole function is to represent his or her ward in the same way that a retained attorney represents his or her client." At 401, 806 P.2d at 50. This is not, however, the question presented by the facts of this case. Tabet was not appointed as advocate for the child, but to examine the settlement for reasonableness and to insure that it protected the minor's interest vis a vis his parents.

Thus, I cannot agree with the distinction for purposes of granting quasi-judicial immunity in this or a similar case. The guardian ad litem is appointed by the court pursuant to its judicial authority. The guardian is appointed to perform an integral part of the judicial process as an arm of the court. Moreover, I am not convinced that, even if a guardian is appointed to a position requiring active advocacy, he should not be granted immunity. I cannot distinguish that role from his role as an arm of the court. It is the court's role to safeguard the interests of the child. If that role requires advocacy, the guardian is, nonetheless, functioning for the court in representing the child, and not, for example, as an attorney hired by the child or its family. I simply cannot separate the guardian's derivative responsibility to the minor from the court's primary responsibility.[5]

---

**5.** Of course, this court would not have to go this far in this case. The issue is only whether a guardian appointed to investigate a settlement and to advise the court as to its reasonableness should be granted immunity. The scope of his authority—to determine the reasonableness of the settlement as between the minor and his parents—should make this an easier case and allow the court to grant immunity as a matter of law.

As the majority notes, a guardian represents the interest of the child and assists the court. *See* at 400, 806 P.2d at 49. Yet, this is not "the rub". The guardian represents the interest of the child in its role as an officer of the court, acting only as must the court in approving a settlement. The majority's test seems unworkable when considered in the context of the guardian always having a duty to the child—it seems to me inconsistent to grant immunity when the guardian functions as a "true" arm of the court when it investigates the fairness and reasonableness of a settlement, yet to deny that immunity for the same role—when it is acting as an advocate for the minor—when that is also the role of the court. A further difficulty in this regard is presented when, as the majority indicates, this issue is resolved by a jury. It is unseemly at best, and an erosion of judicial independence at worst, to present this question, which is, in the first instance, a matter of judicial discretion, to the jury for them to determine in hindsight the scope of the delegation of judicial authority.

Even if I were to agree with the majority's determination that whether immunity attaches is a question turning on the function performed by the guardian, I would disagree with the decision to remand to a jury to determine the nature and extent of the judicial function. The determination of the legal role and the degree to which a guardian may perform a judicial function is a uniquely judicial question that should be decided by the court. As alluded to earlier, trying this case before a jury would inject the jury into a matter of judicial discretion where evidence regarding how a particular guardian may have been chosen would be argued. It would also place the initial judge in the precarious position of defending his practice and explaining his position to the jury, both to the degradation of the judicial office and to the detriment of our court system with its already overcrowded dockets. The system will consume itself as judges are called back for depositions or trial to recall their thought processes in the appointment of every guardian ad litem.

The question before the court was not whether Tabet acted within the scope of his authority as granted by the district court, but whether, as a guardian ad litem, he acted as a judicial officer and was entitled to immunity. I would answer that question with a resounding "yes".[6]

Accordingly, I would extend quasi-judicial immunity to Tabet without requiring a court to first resort to a function-based analysis. Although it seems unfair to me that a guardian ad litem should be subject to liability when it performs a judicial task, it is more significant to me that, by not granting immunity, this court erodes judicial independence by subjecting judgments to collateral suits and by allowing a matter committed to judicial discretion to be attacked in this manner. From my examination of this issue, it is not clear whether a guardian ad litem is always used appropriately, or is even necessary in the circumstances that one is often used. However, assuming the utility of such an office, in the wake of the majority's opinion, I cannot imagine that many attorneys will be willing to subject themselves to potential liability far in excess to the benefits of the post.

---

6. My proposed resolution of this issue has solid support in precedent from other jurisdictions that favor extending absolute quasi-judicial immunity to guardians ad litem. *See, e.g., Cok v. Cosentino,* 876 F.2d 1 (1st Cir.1989); *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir.1984); *In re Scott County Master Docket,* 618 F.Supp. 1534 (D.Minn.1985), *aff'd in part sub nom. Myers v. Morris,* 810 F.2d 1437 (8th Cir.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *Tindell v. Rogosheske,* 421 N.W.2d 340 (Minn.Ct. App.), *aff'd,* 428 N.W.2d 386 (1988); *see also* at 397, 806 P.2d at 46.